64 P.3d 22 (2003)
148 Wash.2d 788
Patricia S. MICHAK, a single person, Respondent,
v.
TRANSNATION TITLE INSURANCE COMPANY, an Arizona corporation, Petitioner.
No. 71783-4.
Supreme Court of Washington, En Banc.
Argued June 11, 2002.
Decided March 6, 2003.
*23 Ryan Sells Uptegraft Inc., James Sells, Silverdale, for Petitioner.
Thomas Miller, Olympia, for Respondent.
OWENS, J.
In reviewing the trial court's dismissal on summary judgment of an insured's breach of contract claim, we must initially determine whether a title insurance company was contractually precluded from amending, prior to issuing its policy, the legal description of the subject property included in its preliminary title commitment. If we determine that the preliminary commitment contained no such bar, we must then consider whether, by initialing at closing the corrected one-page legal description of the property, the insured accepted the insurer's amendment of the description in its preliminary title commitment.
Because we conclude, first, that the insurer was entitled to amend the legal description in the preliminary commitment and, second, that the insured's initials demonstrated assent to the amendment, we reverse the Court of Appeals and reinstate the trial court's summary dismissal of the insured's suit.

FACTS
In July 1997, Patricia Michak asked Transnation Title Insurance Company (Transnation) to provide title insurance and escrow services for her purchase of real property in Kitsap County. Michak was purchasing the property from the bankruptcy trustee of Brent C. Hart.[1] Hart had acquired the property in April 1990 by statutory warranty deed.
*24 On July 7, 1997, Transnation issued Michak a preliminary title commitment. The first paragraph of Transnation's standard form "Commitment for Title Insurance" (Commitment) provided as follows:
Transnation ... hereby commits to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby in the land described or referred to in Schedule A. ...
Clerk's Papers (CP) at 6 (emphasis added). The third paragraph states that
This Commitment is preliminary to the issuance of such policy ... and all liability and obligations hereunder shall cease and terminate six months after the effective date hereof or when the policy or policies committed for shall issue, whichever first occurs, provided that the failure to issue such policy or policies is not the fault of the Company.
Id. (emphasis added). The Commitment was made subject to the conditions set forth on the back of the form, in Schedule B, and in the requested policy. Id. Schedule A is a two-page document, its second page being devoted exclusively to the legal description of the property. There, the second of two easements is identified as "an easement for ingress and egress 60 feet in width as described in documents filed under Auditor's File Nos. 7804180111 and 7804180112." CP at 9 (emphasis added).
Approximately two weeks after Transnation issued the Commitment, the seller alerted Transnation that the width of the second easement had previously been reduced. On or around July 24, 1997, Transnation received the auditor's file documents showing that Hart had formally extinguished the easement in June of 1994, receiving as return consideration an alternative easement 30 feet in width. Susan Bane, a Transnation title officer, testified that she then prepared a supplement to the Commitment to correct the legal description in Schedule A. The "Supplemental No. 1 to the First Commitment" (Supplemental) is a two-page document. CP at 45-46. Appearing in bold print on the first page is the statement "ATTENTION: This Supplemental contains changes which impact title to property set forth in the above-referenced commitment." CP at 45. The first page, which bears Bane's signature, states the effective date of the Supplemental as August 1, 1997, and announces two changes: (1) the legal description in paragraph 3 of Schedule A "is amended as hereto attached," and (2) paragraph 5 in Schedule B is deleted. The attachment to the Supplemental is the one-page legal description previously included as page 2 of Schedule A in the Commitment, the sole change in the document being the alteration of "60" to "30." CP at 46. The first page of the Supplemental indicates that it was "[p]repared for" Debi Delimont in Transnation's escrow department, Interwest Bank, and the real estate agents for the seller and purchaser. CP at 45. Bane testified that by company practice the Supplemental would have been transmitted to those four parties by courier. CP at 109.
Delimont, the Transnation escrow agent who handled the closing of the transaction, stated by affidavit that she "recall[ed] ... that there was a supplement to the preliminary commitment for title insurance which changed the legal description of an easement from 60 to 30 feet in width," CP at 116, and she attached to her declaration a copy of the Supplemental held in the company's file. The escrow file contained the first page of the Supplemental, its second page (that is, the amended legal description), and the original of a duplicate of the second page bearing both the seller's and buyer's initials. CP at 118-20. Delimont declared that Transnation's policy was "to have all closing documents signed or initialed, as [Transnation] cannot close a transaction without proper signatures." CP at 116. From the record before us, the seller initialed the amended legal description on or before August 4, 1997. See CP at 76. Michak has formally admitted that she "initialed [the amended legal description] at closing." CP at 73. By affidavit, Michak acknowledged going to Transnation's Silverdale office, meeting with Delimont, and "sign[ing] all the *25 closing documents."[2] Michak stated that she "recall[ed] signing on[e] copy of a legal description" and "remember[ed] it as a single sheet separate from any other document." CP at 144; see also CP at 73. Two days later, on August 14, 1997, Transnation issued its "Owner's Policy of Title Insurance" (Policy). CP at 28-30. The Policy included the correct legal description, showing the easement of access as 30 feet wide.[3]
Michak contends that she learned of the reduced width of the easement the following year when she began to develop the property. Michak contacted Transnation for clarification, and on February 18, 1998, Transnation faxed her copies of the recorded documents altering the width of the easement. See CP at 39-41, 145. On May 15, 1998, Michak wrote Transnation, seeking a new easement or money damages. When her claim was denied, Michak filed suit against Transnation, asserting breach of contract. Michak contended that Transnation "had failed to uncover the release of this easement when it prepared its Commitment," that it had thus "breached its commitment for title insurance," and that it was "obligated under its Commitment ... to acquire or create the interest of this easement." CP at 4.
On January 13, 2000, the trial court granted Transnation's motion for summary judgment. Michak appealed, and in a split decision, the Court of Appeals reversed the trial court, remanding for further proceedings. Michak v. Transnation Title Ins. Co., 108 Wash.App. 412, 31 P.3d 20 (2001).

ISSUES
(1) Did anything in the Commitment preclude Transnation from amending the legal description of the property in Schedule A prior to issuing its Policy?
(2) If not, by initialing at closing the one-page legal description of the property that had been attached to the Supplemental, did Michak accept Transnation's amendment of the legal description in Schedule A?

ANALYSIS
Standard of Review. The trial court dismissed on summary judgment Michak's breach of contract claim against Transnation. Appellate review of summary judgment is de novo; the reviewing court engages in the same inquiry as the trial court and views the facts and the reasonable inferences from those facts in the light most favorable to the nonmoving party. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982). A motion for summary judgment is properly granted where "there is no genuine issue as to any material fact and... the moving party is entitled to a judgment as a matter of law." CR 56(c). Where the moving party brings forth admissible evidence supporting its claimed absence of any issue of material fact, the "adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." CR 56(e) (emphasis added). A court weighing a summary judgment motion thus places "the emphasis ... upon facts and regards a fact as "an event, an occurrence, or something that exists in reality." Grimwood v. Univ. of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988) (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 813 (1976)). *26 Permissibility of Transnation's Amendment of Schedule A. Transnation argued in its summary judgment motion that Michak could not rely for coverage on the original Commitment because she had initialed at closing the one-page legal description of the property that had been attached to the Supplemental, amending Schedule A. But Michak countered that Transnation had failed to "inform [her] of any change in the Commitment," CP at 142, and had thus changed the Commitment unilaterally.[4] Having failed to persuade the trial court, Michak argued to the Court of Appeals that "Transnation had a contract obligation under the Commitment ... to provide her a Title Policy consistent with the property described in its Schedule A or as amended by Supplement." Br. of Appellant at 7. To support her point that Transnation was not entitled to amend the Commitment, she quoted the following stipulation found in the Commitment:
"(2) If the proposed insured has or acquires actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge. If the proposed insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions and Stipulations."
Id. at 9 (quoting CP at 7).
Stipulation 2, however, has nothing at all to do with Transnation's amendment of the legal description of the property in Schedule A. As "essential elements" of a preliminary title commitment, "[t]he legal description of the land" is an element distinct from "[t]he title defects that the title company would not be willing to eliminate if the policy were then being written." 3 WASH. STATE BAR ASS'N, WASHINGTON REAL PROPERTY DESKBOOK § 39.10, at 39-15 (3d ed.1996) (listing the seven "essential elements of any commitment"). The legal description is a component of Schedule A, while the exceptions "that is, matters that the title company will not insure"are enumerated in Schedule B. Id. at 39-18, 39-20. Schedule B in the Commitment thus sets forth the exceptions to be contained in Schedule B of the Policy, unless the matters giving rise to those exceptions were resolved to the Company's satisfaction prior to the Policy's issuance.[5]
Stipulation 2, which Michak quoted, did not contractually obligate Transnation to treat the newly discovered information regarding the easement as a Schedule B exception. Rather, Stipulation 2 placed a burden on the insured and conferred an option on the insurer. First, the stipulation imposed on the insured a duty to disclose to the insurer "any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment." CP at 7. Second, the stipulation gave the insurer the "option" to limit its exposure under the anticipated policy by "amend[ing] Schedule B," if the insured disclosed (or the insurer otherwise acquired) such knowledge. Id. (emphasis added). Assuming the information concerning the reduction in the 60-foot easement may be described as knowledge of some "other matter affecting the estate ... covered by th[e] Commitment," it was nonetheless not the type of information that would have prompted Transnation to amend Schedule B. Because Transnation's receipt of actual knowledge of the recorded document left no doubt *27 about the nature of the easement benefiting the subject property, the document did not cloud the title or otherwise create any doubt as to whether an adverse claimant could come forward. That half the easement had been legally extinguished was a fact. Indeed, had Transnation simply added an exception to Schedule B (excepting from coverage the formally extinguished 30 feet of the easement), the company would arguably have been taking a misleading stepone implying its uncertainty about the validity of the extinguishment of half the width of the easement. Again, there was no such uncertainty.
In sum, Transnation has produced cogent evidence that it issued the Supplemental on August 1, 1997, amending the legal description of the property in Schedule A, see CP at 45-46, 106, 109, and Michak has cited no provision in the Commitment precluding Transnation from amending the Schedule A description.[6] Stipulation 2 pertains to Schedule B and simply has no bearing on Transnation's amendment of the legal description in Schedule A.[7]
Effect of Michak's Initialing the Corrected Legal Description at Closing. The undisputed fact is that at closing, prior to the issuance of the Policy, Michak initialed the second page of the Supplemental, which contained the correct legal description of the property, showing the easement's width as 30 feet. Because Michak contends that she was not shown the first page of the Supplemental, the precise question on summary judgment is whether, absent proof that she had also been given the Supplemental's cover page, her initials were a sufficient indication that she had accepted Transnation's amendment to Schedule A.[8] We conclude that they were.
The legal significance of Michak's initialing the correct legal description of the property is settled: "It is a general rule that *28 a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents." Nat'l Bank of Wash. v. Equity Investors, 81 Wash.2d 886, 912, 506 P.2d 20 (1973) (citing Perry v. Cont'l Ins. Co., 178 Wash. 24, 28, 33 P.2d 661 (1934)). In National Bank the issue was whether a person was bound by an agreement subordinating his lien on a piece of real property to another lender. This court directed the superior court to enter judgment against him because he had signed the agreement. Id. at 913, 506 P.2d 20. This follows the traditional duty to read in contract law: "[A] party who signs an instrument manifests assent to it and may not later complain about not reading or not understanding." JOHN D. CALAMARI & JOSEPH M. PERILLO, THE LAW OF CONTRACTS 376 (4th ed.1998); see also Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc., 96 Wash.2d 939, 943-44, 640 P.2d 1051 (1982). The rule would be different had Michak been "deprived of the opportunity to read" the revised legal description or had she been a victim of "fraud, deceit, or coercion." Yakima County (W.Valley) Fire Prot. Dist. No. 12 v. City of Yakima, 122 Wash.2d 371, 389, 858 P.2d 245 (1993). But she asserts no such defenses to the enforcement of the contract. In sum, under Washington law, because Michak initialed the correct legal description of the property to be insured, she cannot disavow assent to Transnation's amendment of the legal description in Schedule A.

CONCLUSION
Michak has identified no provision in the Commitment that precludes Transnation from amending the legal description of the property in Schedule A prior to issuing the Policy. Recalling that a fact is "an event, an occurrence, or something that exists in reality," Grimwood, 110 Wash.2d at 359, 753 P.2d 517, we rest our resolution of Transnation's summary judgment motion on two facts: (1) that Transnation issued its Supplemental prior to the transaction's closing and the issuance of its Policy and (2) that Michak initialed at closing the corrected legal description that Transnation had originally attached to its Supplemental. On these facts, Michak has no viable claim that Transnation breached its commitment to provide title insurance. The Commitment's legal description of the property was properly corrected prior to issuance of the Policy, Michak acknowledged the corrected description, and Transnation's Policy insured the property that Michak purchased.
The Court of Appeals decision is reversed, and the trial court's order granting Transnation's motion for summary judgment is reinstated.
WE CONCUR: ALEXANDER, C.J., and JOHNSON, MADSEN, IRELAND, BRIDGE, CHAMBERS, JJ., and SMITH, J.P.T.
SANDERS, J. (concurring).
The parties to this action dispute the lawful right of the title insurance company, if any, to change the legal description of the property to be actually insured in the final policy from the description of the property described in the preliminary commitment. However whether the insured had notice, much less consented to modify the preliminary commitment, is academic under the facts of this case which lends itself to a far simpler resolution.
Nothing could be more axiomatic than the fundamental proposition that a title insurer need not insure title to more property than that purportedly conveyed to its insured. D. BARLOW BURKE, JR., LAW OF TITLE INSURANCE § 3.2.3, at 3:27-28 (2d ed.1993). "An insured cannot insure what he [or she] does not own, no matter what the policy says: In the quaint phrase of the law, the stream can rise no higher than its source." Id.
Transnation committed "to issue its policy or policies of title insurance, as identified in Schedule A, in favor of the proposed insured named in Schedule A, as owner or mortgagee of the estate or interest covered hereby...." Clerk's Papers (CP) at 6 (emphasis added). Schedule A to the preliminary commitment contained a property description that included a 60-foot easement. Id. at 9. However, Ms. Michak ultimately purported to purchase property with only a 30-foot easement. Id. *29 at 135. Transnation cannot be faulted for refusing to issue a policy insuring title to a portion of an easement its insured never purchased anymore than it could be faulted for not issuing a title policy if the whole deal fell through.
But our majority looks to the closing documents for all the wrong reasons. Relying on National Bank of Washington v. Equity Investors, 81 Wash.2d 886, 506 P.2d 20 (1973), it treats Ms. Michak's purchase of the property as consent to modify her contract with Transnation. See majority at 27-28. On the contrary, National Bank relates exclusively to imputed knowledge between two contracting parties, i.e., the purchaser and the seller.
It is a general rule that a party to a contract which he has voluntarily signed will not be heard to declare that he did not read it, or was ignorant of its contents.... The whole panoply of contract law rests on the principle that one is bound by the contract which he voluntarily and knowingly signs.
Id. at 912-13, 506 P.2d 20 (emphasis added). Ms. Michak's signature on the closing documents imputes knowledge as to her contract with the seller; it has no bearing on her contract with Transnation. It certainly does not serve as an implied or express agreement to modify the preliminary commitment contract with Transnation,[1] see majority at 28, anymore than Transnation could be compelled to issue title insurance for more property than was described in the preliminary commitment if the insured purchased additional parcels at closing with notice to its insurer. Even if Transnation had expressly, and without factual dispute, informed Ms. Michak of its decision to insure less than the property described in the preliminary commitment, that would not change its responsibility to live up to the legal obligation it assumed in the preliminary commitment.
Had the insured actually purported to purchase a 60-foot easement, rather than a 30-foot one, this would be an entirely different case. But Transnation got lucky.
For the reasons stated above I agree the trial court's order should be affirmed.
NOTES
[1] The purchase and sale agreement was not included in the record.
[2] CP at 144. Michak states that the signing occurred on August 8, 1997, but that is apparently an error; although the Deed of Trust was drawn on August 8, Delimont notarized Michak's signature on that document on August 12, 1997, which was also the date on which Michak signed the Real Estate Excise Tax Affidavit. CP at 75, 84. All of the closing documents, including the Real Estate Excise Tax Affidavit and the Deed of Trust, refer to the correct legal description of the property. CP at 75-76, 77-89.
[3] CP at 31. Although the content of the legal description in the Policy is identical to the description in the Supplemental's attachment, the layout of the two pages is different; plainly, Michak's initials were on the attachment to the Supplemental, see CP at 47, not the description ultimately included a few days later in the Policy itself.
[4] Although Michak asserted no negligence claim in her complaint, she argued in her summary judgment memorandum and to the Court of Appeals that Transnation had breached a duty to use reasonable care in communicating the new information to her. See CP at 143; Br. of Appellant at 13-14.
[5] Compare Commitment's Supplement B, CP at 10, with Policy's Supplement B, CP at 67-68.
[6] Indeed, the implication that Transnation was not at liberty to correct the legal description once it had, in Michak's words, "failed to uncover the release of this easement when it prepared its Commitment," CP at 4, runs counter to this court's recent decision in Barstad v. Stewart Title Guaranty Co., 145 Wash.2d 528, 39 P.3d 984 (2002). There, this court made clear that "a preliminary commitment is not a representation of the condition of title, but a `statement of terms and conditions upon which the issuer is willing to issue its title policy, if such offer is accepted.'" Id. at 536, 39 P.3d 984 (quoting RCW 48.29.010(3)(c)). As Transnation has observed, by permitting no correction of the legal description, the Court of Appeals majority effectively "transformed Transnation's preliminary commitment into an abstract of title, a guarantee of the condition of the title," and "impose[d] duties upon Transnation which exist neither by statute [n]or in the applicable document itself." Suppl. Br. of Pet'r at 8-9. Similarly, the concurrence in the present case maintains that, "[e]ven if Transnation had expressly, and without factual dispute, informed Ms. Michak of its decision to insure less than the property described in the preliminary commitment, that would not change its responsibility to live up to the legal obligation it assumed in the preliminary commitment." Concurrence at 29.
[7] Stipulation 2 was a red herring that drew the Court of Appeals majority far from the beaten path. The majority took two notably false steps: it applied a stipulation pertaining to the amendment of Schedule B to Transnation's amendment of Schedule A, and it defied rules of grammar and logic by insisting that "or" meant "and" in that inapplicable stipulation. The dissent aptly noted that the majority had "modifie[d] the contract language" when it concluded that Transnation could amend the Commitment only after the insured acquired actual knowledge of a potential title defect. Michak, 108 Wash.App. at 429, 31 P.3d 20 (Armstrong, C.J., dissenting).
[8] Given that Transnation issued an amendment to Schedule A, a question that need not be answered here is whether Transnation was obligated to seek Michak's acceptance of its correction of the legal description. The Washington Real Property Deskbook contains the following caution:

[The legal description of the land in Schedule A] generally will be the same as contained on the recorded conveyances or mortgages in the chain of title, but may not be. If the description is changed from the record, or from that supplied with the application for insurance, the commitment will usually point this out and request that the parties confirm the use of a different description.
WASHINGTON REAL PROPERTY DESKBOOK, supra, § 39.10(2)(b), at 39-18 (emphasis added). Among its "Practice Tips" for handling closings, the Deskbook offers the following advice: "Read the legal description. The title company may not advise the parties that the description in the commitment differs from the description submitted with the application or from the record title." Id. § 39.11, at 39-21 (emphasis added). While these comments are directed toward differences between the descriptions the insured submitted and the insurer then used in the preliminary commitment, they suggest that the insurer has no contractual obligation to mirror the insured's initial request.
[1] The record, moreover, does not support the majority's assertion that Transnation delivered a Supplemental to its preliminary commitment to Ms. Michak's real estate agent or the "undisputed fact" she initialed the second page of the Supplemental at closing. Majority at 24, 27.

Transnation does not deny the two real estate agents who received the Supplemental, see CP at 109, represented the seller, not Ms. Michak. Supplemental Br. of Resp't at 2; Wash. State Supreme Ct. oral argument, Michak v. Transnation Title Ins. Co., No. 71783-4 (June 11, 2002), audio recording by TVW, Washington State's Public Affairs Network, available at http:// www.tvw.org. Susan Jo Bane, title officer for Transnation, admits the title insurance department did not deliver the Supplemental to Ms. Michak, CP at 111, and there is no evidence that any other department delivered the Supplemental to her.
Ms. Michak admits she signed a document with a legal description of the property, but asserts it was presented to her as a single sheet separate from any other pagesnot as a part of a supplement to the preliminary commitment. CP at 144; majority at 27. This is consistent with the peculiar appearance of the Supplemental, which consists of three pages, whereby the second and third pagesboth designated as page "2"are identical but for Ms. Michak's initials on the third page and only the third page is initialed. CP at 90-92. This is also consistent with the declaration of Ms. Delimont, escrow officer for Transnation, stating the escrow policy was to have all documents initialed at closing. CP at 116.