# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FRANK BUCCI,

             Appellant,

             v.

NORTHWEST TRUSTEE SERVICES,
INC., a Washington corporation,
RCO LEGAL P.S., Washington
Professional Services Organization,
JPMORGAN CHASE BANK, N.A., a
national banking association, US BANK,
NATIONAL ASSOCIATION, a national
banking Association, SELECT
PORTFOLIO SERVICING, INC., a
Foreign Corporation registered in
Washington,

             Respondents.

No. 73406-7-I

DIVISION ONE

PUBLISHED OPINION (IN PART)

FILED: December 27, 2016

MANN, J. — In 2009, Frank Bucci defaulted on a $1.53 million promissory note secured by a deed of trust on his home. In 2013, U.S. Bank, N.A. as trustee (USB), the current beneficiary and holder of Bucci's promissory note, initiated nonjudicial foreclosure proceedings. Bucci responded by filing an action for declaratory and injunctive relief seeking to enjoin the nonjudicial foreclosure. Bucci's action included

claims under the Consumer Protection Act, chapter 19.86 RCW, and for negligence against USB; Select Portfolio Servicing, Inc. (SPS), the current loan servicer; JPMorgan Chase Bank, N.A. (Chase), the previous beneficiary of Bucci's promissory note; Northwest Trustee Services (NWTS), the trustee; and RCO Legal, P.S. (RCO), NWTS's law firm. The trial court dismissed Bucci's action on the respondents' motions for summary judgment. In the published portion of this decision, we conclude that the note was negotiable and properly admitted; we therefore affirm the dismissal of claims against USB and SPS. In the unpublished portion of this decision, we affirm the trial court's dismissal of all other claims.

## FACTS

### I.

In May 2007, Frank Bucci received a $1.53 million refinance loan from Washington Mutual bank, F.A. (Washington Mutual) and signed an adjustable rate note (note) as evidence of his obligation to repay the loan. To secure repayment of the debt, Bucci granted Washington Mutual a deed of trust (deed) encumbering his personal home and property located on the Reserve at Newcastle golf course in Washington.

The note and deed contain several key provisions relevant to this appeal. At the outset, the note explained that changes in the interest rate may result in an increase in the principal:

> THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN 115% OF THE ORIGINAL AMOUNT (OR

$1,759,500.00).  MY INTEREST RATE CAN NEVER
EXCEED THE LIMIT STATED IN THIS NOTE OR ANY
RIDER TO THIS NOTE.  A BALLOON PAYMENT MAY BE
DUE AT MATURITY.

Section 1 of the note contains Bucci's promise to pay $1.53 million "plus any amounts added in accordance with Section 4(G) below, (this amount is called 'Principal'), plus interest, to the order of the Lender."

Section 4 of the note is titled "Interest Rate and Monthly Payment Changes." Sections 4(A) through (C) explain that the interest rate charged is subject to change on a monthly basis and determined by adding 2.5 percentage points to the "index"–a twelve-month average of the annual yields of United States Treasury Securities. Section 4(D) caps the interest rate at 9.7 percent.

Under the note, Bucci's payments are also subject to change.  Section 4(E) explains that, unlike the interest rate that can change monthly, Bucci's monthly payments are calculated once a year.  Bucci pays the amount set on July 1st each month for twelve months until the monthly payments are recalculated on July 1st of the following year.  Bucci's monthly payment is the "monthly payment that would be sufficient to repay the projected principal balance [Bucci is] expected to owe as of [July 1st] in full on the Maturity Date at the interest rate in effect 45 days prior to [July 1st] in substantially equal payments."  Section 4(F) explains that the newly calculated monthly payment is capped at 7.5 percent more or less than the amount of the monthly payment during the year before.

Section 4(G) of the note is titled "Changes in [the] Unpaid Principal Due to Negative Amortization or Accelerated Amortization."  Section 4(G) explains:

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad[d] the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess toward a reduction of the Note.

Section 7(B) of the note states, "[i]f I do not pay the full amount of each monthly payment on the date it is due, I will be in default."

Section 22 of the deed provides, "If the default is not cured . . . Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and/or any other remedies permitted by Applicable Law."

## II.

In June 2007, Washington Mutual indorsed in blank,[1] sold, and deposited Bucci's loan into a loan trust titled WaMu Mortgage Pass-Through Certificates Series 2007-OA6 Trust (WaMu Trust).[2] As a result of the sale, the WaMu Trust owned and was the beneficiary of Bucci's note. Under the terms of the sale, the original trustees of the Wamu Trust was LaSalle Bank, N.A. Washington Mutual continued to service the note.

After Washington Mutual failed in September 2008, the Federal Deposit Insurance Corporation (FDIC) placed the bank into receivership. The FDIC then sold

---

[1] A note indorsed in blank is payable to the bearer and "may be negotiated by transfer of possession alone." RCW 62A.3-205(b).

[2] The parties refer to the pooled trust as either the "Loan Trust" or "WaMu Trust." We use "WaMu Trust" in this opinion.

-4-

Washington Mutual's assets to Chase.[3] Under the sale agreement, "[Chase] specifically purchase[d] all mortgage servicing rights and obligations of [Washington Mutual]." As of September 2008, Chase began servicing the note for the WaMu Trust.

In October 2008, LaSalle Bank N.A., merged into, and subsequently operated as part of, Bank of America, N.A. (BofA). As of October 2008, BofA became trustee of the WaMu Trust, and was the beneficiary of the note.[4]

On January 29, 2009, BofA executed a limited power of attorney in favor of Chase authorizing Chase to, among other things, complete a nonjudicial foreclosure and appoint a successor trustee to serve under the deed. Chase continued to service the loan and as its attorney-in-fact, held the note on behalf of the beneficiary BofA.

Bucci defaulted on the note in March 2009. In April 2009, Chase notified Bucci that he was in default. Chase's notification letter included contact information for its loan modification hotline.

On July 16, BofA, through Chase, recorded an appointment of successor trustee. The appointment named NWTS as successor trustee under the deed.

NWTS recorded the first notice of trustee's sale in King County on August 14, 2009, setting the sale for November 13, 2009. The trustee's sale was postponed and later discontinued. NWTS recorded a second notice of trustee's sale on July 8, 2010, setting the sale for October 8, 2010. The second sale was also discontinued.

---

[3] (Purchase and Assumption Agreement between FDIC and Chase; see also Purchase and Assumption Agreement, Federal Deposit Insurance Corporation (2008), https://www.fdic.gov/about/freedom/washington_mutual_p_and_a.pdf (same)).

[4] The full name of the beneficiary was "Bank of America, National Association as successor by merger to "LaSalle Bank NA as trustee for WaMu Pass-Through Certificates Series 2007-0A6 Trust." For simplicity we will refer to the beneficiary as "BofA."

On May 12, 2011, NWTS was notified that USB had succeeded BofA as trustee of the WaMu Trust. Consequently USB was the new beneficiary of the note.[5]

Almost two years later on March 12, 2013, NWTS sent Bucci a second notice of default. The notice identified the owner of the note as "U.S. Bank National Association, as Trustee, [of the WaMu Trust]."

In April 2013, Bucci elected to pursue foreclosure mediation through a referral from the Washington Department of Commerce. The referral identified the owner of the Note as "U.S. Bank National Association, as Trustee, [of the WaMu Trust]." Bucci unilaterally cancelled the mediation.

NWTS recorded the third notice of trustee's sale on June 25, 2013, and set the sale date for October 25, 2013. One day before the scheduled sale, NWTS received confirmation that USB was the deed's beneficiary. The third sale was postponed to January 24, 2014, but did not occur.

On August 1, 2013, Select Portfolio Servicing, Inc., (SPS) took over for Chase as the loan servicer for USB.

Bucci filed suit in August 2013, seeking declaratory judgment and injunctive relief to prevent the nonjudicial foreclosure and sale. The complaint alleged that all defendants were negligent, violated the deed of trust act (DTA), chapter 61.24 RCW, and Washington's Consumer Protection Act (CPA) chapter 19.86 RCW, and their duties of good faith.

---

[5] The full name of the beneficiary was "U.S. Bank National Association, as Trustee, successors in interest to Bank of America, National Association as Trustee as successor by merger to Lasalle Bank, National Association as Trustee for WaMu Mortgage Pass-Through Certificates Series 2007-0A6 Trust." For simplicity we refer to the beneficiary as "USB as trustee."

All the defendants moved for summary judgment. The trial court granted the defendants' motions and dismissed all of Bucci's claims. Subsequent to the dismissal, the trial court granted a motion on the merits previously filed by Chase seeking dismissal based on federal preemption. Bucci timely appealed both orders. We affirm.

ANALYSIS

This court reviews summary judgment decisions de novo, engaging in the same inquiry as the trial court. Michack v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003). Summary judgment is appropriate if, viewing the facts and reasonable inferences in the light most favorable to the nonmoving party, no genuine issues of fact exist and the moving party is entitled to a judgment as a matter of law. Michak, 148 Wn.2d at 794-95. "A genuine issue of material fact exists if reasonable minds could differ about the facts controlling the outcome of the lawsuit." Barkley v. Greenpoint Mortg. Funding, Inc., 190 Wn. App. 58, 65, 358 P.3d 1204 (2015).

Summary judgment "is subject to a burden shifting scheme." Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). The moving party meets its initial burden by submitting evidence demonstrating that it is entitled to a judgment as a matter of law. Ranger, 164 Wn.2d at 552. The burden then shifts to the nonmoving party to set forth "specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." Ranger, 164 Wn.2d at 552 (quoting Meyer v. Univ. of Wash., 105 Wn.2d 847, 852, 719 P.2d 98 (1986)). To accomplish this, the nonmoving party "may not rely on speculation [or] argumentative assertions that unresolved factual issues remain." Ranger, 164 Wn.2d at 552 (quoting Seven Gables Corp. v. MGM/UA Entm't Co., 106 Wn.2d 1, 13, 721 P.2d 1 (1986).

I.

Under the Uniform Commercial Code (UCC) Title 62A RCW, the "holder" of an instrument, including a promissory note, is the "person entitled to enforce" the terms of the note. RCW 62A.3-301; RCW 62A.3-104(e). The holder of the note is the beneficiary of a deed of trust securing the note and is entitled to enforce the deed of trust through the nonjudicial foreclosure procedure set out in Washington's DTA. Bain v. Metropolitan Mortg. Group, Inc., 175 Wn.2d 83, 104, 285 P.3d 34 (2012).

USB sought dismissal of Bucci's claims on summary judgment claiming that as the holder of the note, it was entitled to enforce the terms of the note. The trial court agreed and granted summary judgment in favor of USB. Bucci assigns three errors to the trial court's decision: (1) the court erred in accepting testimony and evidence offered by USB's attorney; (2) the note was not a "negotiable instrument" and therefore fell outside of the UCC; and (3) the court erred in weighing evidence. We disagree and address each argument in turn.

A.

Bucci argues the trial court erred in admitting a declaration from USB's attorney, J. Will Eidson. Bucci objects specifically to the statement in Eidson's declaration attaching a true and correct copy of the note and declaring that "[t]he current holder of the Note and Deed of Trust is U.S. Bank N.A., as trustee." Bucci argues that Eidson was prohibited from testifying by the Rules of Professional Conduct, the Rules of Evidence, and CR 56(e) because he lacked personal knowledge of whether USB was the holder of the note.

-8-

But whether Eidson's testimony was admissible is irrelevant because the declaration was not necessary to prove that USB was the holder of the note. USB did not rely on Eidson's declaration or the copy of the note; instead at the summary judgment hearing USB offered the original note. As the trial court confirmed:

> For the purposes of the record and for clarity I am reviewing the adjustable rate note involving the property at 8102 155th Avenue Southeast Newcastle, Washington 98059. A copy of which was previously provided.
>
> There being no articulable basis to dispute authenticity, I would note that same on page 3 of 6 it appears identical to the one submitted. There are no modifications to the original thus far at page 4. There's the original signature. And the prepayment fee note addendum also made May 22, 2007. I didn't include the date, did I, -- which is also the date of the adjustable rate note. Also signed by the borrower.
>
> Thank you, Counsel. The originals, as presented to the Court, are identical to the copies provided. I did have an opportunity to observe the original signature of Mr. [Bucci].[6]

Under the UCC, the "holder" of the note is "the person in possession of a negotiable instrument that is payable either to the bearer or to an identified person that is the person in possession." RCW 62A.1-201(b)(21)(A). The "[m]ere production of a note establishes prima facie authenticity and is sufficient to make a promissory note admissible." United States v. Varner, 13 F.3d 1503, 1509 (11th Cir. 1994) (citing United States v. Carriger, 592 F.2d 312, 316-17 (6th Cir. 1979)). USB produced the original note, indorsed in blank, for inspection by the trial court. This was sufficient to prove the status of USB as the holder of Bucci's note. See Deutsche Bank Nat. Trust Co. v. Slotke, 192 Wn. App 166, 175-76, 367 P.3d 600 (2016).[7]

---

[6] Report of Proceedings (Feb. 27, 2015) at 7.
[7] As stated in Deustche Bank, "we express no opinion whether this is the exclusive method for the holder of a note to prove its right to enforce the note." 192 Wn. App. at 175-76. See e.g., Barkley, 190 Wn. App. at 66-68 (note and deed of trust admissible as business records pursuant to RCW 5.45.020).

B.

Bucci argues next that a negative amortizing note is not a negotiable instrument under Washington's UCC because there must be a promise to pay "a fixed amount of money" and the note provides that the principal may change depending on the borrower's payments and interest.[8] Bucci contends that because the note falls outside of the UCC, contract law applies and in order to enforce the note USB needs to establish their rights under common law contracts and demonstrate valid assignments and a chain of title from the original lender.

Under the UCC, a "'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order. RCW 62A.3-104(a). Negotiability is determined from the face, the four corners, of the instrument at the time it is issued without reference to extrinsic facts. 5A RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 3-104:13, at 115 (3d ed. 1994) (citing Holsonback v. First State Bank of Albertville, 394 So. 2d 381, (Ala. Civ. App. 1980)).

Bucci relies primarily on Anderson v. Hoard, 63 Wn.2d 290, 387 P.2d 73 (1963), to support his claim that the note is not negotiable because the principal may increase. Bucci's reliance on Anderson is misplaced. The promissory note in Anderson applied the debtor's installment payments first to the accrued interest, and then, "at the option of the holder, . . . such advances as the holder may have made for taxes, assessments or insurance premiums and other charges on any property mortgaged or pledged to

---

[8] A year after Bucci executed the note, the Washington State Legislature passed legislation prohibiting a financial institution from making a residential mortgage loan with "any provisions that impose negative amortization." RCW 19.144.050 (effective June 12, 2008). In May 2007, however, a residential loan with negative amortization provisions was lawful.

secure this note," and finally to the reduction of principal. Anderson, 63 Wn.2d at 291.

At the time of the Anderson decision, former RCW 62.01.001 (1995), required a negotiable instrument to "contain an unconditional promise or order to pay a sum certain in money." (Emphasis added.) Because the promissory note in Anderson provided for the repayment of unknown amounts of future taxes, assessments, insurance premiums, and other charges, the court found that the note did not contain a promise to pay a sum certain and was therefore not negotiable. Anderson, 63 Wn.2d at 293-94.

RCW 62.01.001 was subsequently repealed and replaced by the current definition of a "negotiable instrument" in RCW 62A.3-104(a).[9] Under the current definition, a "'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." RCW 62A.3-104(a) (emphasis added). Further, under RCW 62A.3-112(b): "Interest may be stated in an instrument as a fixed or variable amount of money or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument." (Emphasis added.) Thus,

---

[9] Bucci also relies on brief passages in two law review articles to support the argument that a loan with a negative amortization feature is not negotiable. Neither article is persuasive. In the first, Elizabeth Renuart, Uneasy Intersections: The Right To Foreclose and the U.C.C., 48 WAKE FOREST L. REV. 1205, 1231 (2013), the author relies on the unpublished California U.S. District Court opinion in Ralston v. Mortgage Investors Grp., Inc., No. C 08-536 JF (PVT), 2010 WL 3211931 (N.D. Cal. Aug. 12, 2010) for the proposition that inevitable negative amortization renders the actual principal amount uncertain. Ralston concerned a fraudulent omission claim under California law. It is not a UCC case and does not address whether a negative amortization feature renders a promissory note nonnegotiable.

In Kathleen C. Engel and Thomas J. Fitzpatrick IV, Complexity, Complicity, and Liability up the Securitization Food Chain: Investor and Arranger Exposure to Consumer Claims, 2 Harv. Bus. L. Rev. 345, 358 n.50 (2012), the authors state, "Arguably, loans with negative amortization could be for uncertain sums because the principal balance can increase over time." The authors provide no support this claim other than a contrary authority in Goss v. Trinity Savings & Loan Ass'n., 1991 OK 19, 813 P.2d 492.

negotiability exists if the fixed amount can be determined from the face of the instrument, except for amounts of interest, for which reference to information not contained in the note is allowable.

As Division Two of this court recently explained: "A reference to another writing does not of itself make the promise or order conditional. We analyze the promissory notes' contents to determine whether the notes' holder could determine her or his rights, duties, and obligations with respect to the payment on the notes without having to examine any other documents." Alpacas of America, LLC v. Groome, 179 Wn. App. 391, 397, 317 P.3d 1103 (2015) (citing RCW 62A.3-106 cmt. 1). Indeed, as explained in comment 1 of RCW 62A.3-106, the rights, duties, and obligations of the transferee—not the current balance—must be found on the face of instrument:

> The rationale is that the holder of a negotiable instrument should not be required to examine another document to determine rights with respect to payment. But subsection (b)(i) permits reference to a separate writing for information with respect to collateral, prepayment, or acceleration.
>     Many notes issued in commercial transactions are secured by collateral, are subject to acceleration in the event of default, or are subject to prepayment, or acceleration does not prevent the note from becoming an instrument if the statement is in the note itself.

RCW 62A.3-106 cmt. 1.

The note here describes Bucci's obligations on its face: "I promise to pay U.S. $1,530,000.00 plus any amounts added in accordance with Section 4(G) below, (this amount called "Principal"), plus interest, to the order of the Lender." Bucci's note fully discloses how interest accrual may result in negative amortization, depending on the amount Bucci chooses to make as a monthly payment. Negative amortization only occurs under the note if Bucci chooses not to pay the full amount of interest due each

month and only if the monthly payment is insufficient to cover the accrued interest. Bucci's note provides for a monthly payment, but Bucci is not limited to paying only the monthly payment amount. The note expressly permits Bucci to make prepayments towards the principal.

RCW 62A.3-104(a) defines a negotiable instrument as "an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order." RCW 62A.3-104(a). Because Bucci's note contains an unconditional promise to pay a fixed amount of $1.53 million plus any amounts added in accordance with the provisions in Section (4)(G) of the note, it is a negotiable instrument as defined in RCW 62A.3-104(a).

C.

Bucci next argues that in granting USB's motion for summary judgment, the trial court erroneously weighed the credibility of the parties' evidence. Specifically, Bucci contends that the trial court weighed evidence concerning whether USB, was the holder of the note and beneficiary of the deed. We disagree.

The UCC sets forth the rules for challenging the originality of a note. A note is original if it contains the original signature of the maker. Under RCW 62A.3-308(a), the validity of signatures are admitted unless specifically denied:

> In an action with respect to an instrument, the authenticity of, and authority to make, each signature on the instrument is admitted unless specifically denied in the pleadings. If the validity of a signature is denied in the pleadings, the burden of establishing validity is on the person claiming validity, but the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead or incompetent at the time of trial of the issue of validity of the signature.

-13-

(Emphasis added.)   Here, USB produced the original of the note before the trial court and the trial court confirmed it contained Bucci's original signature.  Bucci did not dispute the originality of the note or the authenticity of his signature on the note.  Thus, the validity of the signatures is admitted.

Under RCW 62A.3-308(b), if the validity of the signatures is admitted, then so long as the plaintiff producing the instrument is the "holder" of the instrument under RCW 62A.3-301, the plaintiff is "entitled to payment" unless "the defendant proves a defense or claim in recoupment." RCW 62A.3-308(b).  Here, USB was the holder of the original note and the signature on the note was not disputed.

The only defenses raised by Bucci in response to USB's offer of the original note were that (1) the trial court either erred in admitting Eidson's declaration and evidence; and (2) that the note was not negotiable.  As discussed above, both of Bucci's defenses fail as a matter of law.  The trial court did not err in weighing the evidence.  Because Bucci failed to introduce valid evidence disputing that USB was the holder of the original note, there was no evidence for the trial court to weigh.  Summary judgment in favor of USB is affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and the remainder having no precedential value shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

-14-

II.

Bucci next assigns error to the trial court's dismissal of his CPA claims against USB, loan servicer SPS, Chase, NWTS, and its law firm RCO. To prevail in a CPA action the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation. Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 784, 719 P.2d 531 (1986). "Failure to satisfy even one of the elements is fatal to a CPA claim." Sorrel v. Eagle Healthcare, Inc., 110 Wn. App. 290, 298, 38 P.3d 1024 (2002). A presale violation of the DTA may establish an unfair or deceptive act and be compensable under the CPA. Frias v. Asset Foreclosure Servs. Inc., 181 Wn.2d 412, 432-333, 334 P.3d 529 (2014); Lyons v. U.S. Bank, N.A., 181 Wn.2d 775, 784, 336 P.3d 1142 (2014).

A.

Bucci claims that USB and servicer SPS, committed an unfair and deceptive act when it initiated a nonjudicial foreclosure against Bucci on June 26, 2009, in violation of the DTA. We disagree.

Bucci's claim against USB and SPS fails for two reasons. First, USB did not initiate the nonjudicial foreclosure in 2009. The 2009 foreclosure was initiated on behalf of BofA. USB did not become the trustee of the WaMu Trust until May 2011—prior to the third notice of sale. Second, when USB did ultimately initiate nonjudicial foreclosure in 2013, it was the holder of the note and, contrary to Bucci's assertion, the note was a negotiable instrument.

Summary judgment dismissing Bucci's CPA claims against USB and SPS was appropriate as Bucci failed to demonstrate that either entity committed an unfair or deceptive act.

B.

Bucci asserts that Chase committed an unfair or deceptive act when it induced him to stop making his mortgage payments and failed to inform him that if he defaulted they could foreclose on his property. Bucci also asserts that Chase committed an unfair or deceptive act because it lacked authority to appoint NWTS as successor trustee to conduct the nonjudicial foreclosure.[10] We disagree.

1.

In response to Chase's motion for summary judgment, Bucci supported his claim that Chase induced him to quit making loan payments by explaining that after the 2007 housing crash, his property lost approximately one half of its value. In response, while he was still able to make his loan payments, he "hoped to negotiate" new loan terms reflecting "market conditions and the new value" of his property. He then claimed that "on numerous occasions, WaMu told me that it would not work with me regarding a loan modification while I was current on my loan payments."[11] He then relied on the media to support this belief: "'everybody' knew this to be the case and, by that, I mean that due to strong media attention it was basically public knowledge that you had to be behind on your mortgage payments to qualify for a loan modification."

---

[10] Bucci also claims that Chase failed to provide him a preforeclosure letter under RCW 61.24.031. Bucci failed to present substantive argument in support of this claim and it is deemed waived. RAP 10.3(a)(3); Ang v. Martin, 154 Wn.2d 477, 486-87, 114 P.3d 637 (2005).

[11] Bucci later recalled it was Chase that continued to advise him to miss payments.

In response to a motion for summary judgment, a party must "set forth specific facts showing that there is a genuine issue for trial." CR 56(e). A declaration containing only conclusory statements without adequate factual support does not create an issue of material fact that defeats a motion for summary judgment. Lane v. Harborview Medical Center, 154 Wn. App. 279, 288, 227 P.3d 297 (2010).

Bucci failed to meet his burden of demonstrating that Washington Mutual or Chase induced him to stop making loan payments. He offered nothing other than his belief that he needed to default in order to obtain a loan modification. In essence, Bucci alleged only that Washington Mutual, then Chase, informed him that they do not modify performing loans. Bucci failed to demonstrate that Chase induced him to default. Bucci does not allege that he was promised a loan modification if he defaulted—only that he believed that one of the requirements for obtaining a loan modification was to be behind on payments.

Bucci also does not argue that Chase's alleged inducement in any way prevented him from curing his default. To the contrary, while Bucci admitted an obligation to pay, he also admitted that he did not attempt to pay the arrears on his loan after he defaulted because he "didn't want to" since there was "negative equity" in the property. Thus, Bucci failed to cure his default, but does not allege that his failure to cure the default was attributable to Chase's alleged inducement.

Bucci also asserts that Chase acted deceptively by "failing to disclose that if failed to make his payments, they would take his home and not provide him a loan modification."

At the outset, Bucci's disappointment over the denial of his desire for a loan modification is not actionable: "While the parties may choose to renegotiate their agreement, they are under no good faith obligation to do so." Badgett v. Sec. State Bank, 116 Wn.2d 563, 572 87 P.2d 356 (1991). The record shows that Chase tried to help Bucci with a loan modification. Bucci was in favor of a loan modification, but was denied because his unpaid principal exceeded the amount allowed under the Home Affordable Foreclosure Alternative Program limit. Bucci was also denied a short sale because he failed to provide the documents requested by Chase. Further, Bucci unilaterally cancelled his Foreclosure Fairness Act mediation based on his belief that the beneficiary wouldn't mediate in good faith.

Bucci also cannot demonstrate that Chase failed to disclose that the remedy for default was a potential foreclosure sale. Bucci does not dispute that the note includes his express agreement that: "If I do not pay the full amount of each monthly payment on the date it is due, I will be in default." Nor does Bucci dispute that the deed expressly allows for foreclosure sale in the event of a default under the note. While Chase worked with Bucci on a possible loan modification, it was under no obligation to do so.

Bucci also alleges that Chase acted unfairly and deceptively by "dual tracking" him and working with him on a loan modification while simultaneously moving forward with nonjudicial foreclosure. Bucci relies on the unpublished federal district court opinion Singh v. Federal National Mortgage Ass'n, No. C13-1125 RAJ, 2014 WL 504820, at *4-5 (W.D. Wash. Feb. 7, 2014) (court order) for the proposition that "'dual tracking'" is unlawful. But in Singh, there was evidence that the plaintiff "'continually received promises from the representatives at the service center that the foreclosure

-18-

sale would not proceed while their loan modification was being processed.'" Singh, 2014 WL 504820, at *5. Here, Bucci offered no evidence of any such promises. Moreover, Bucci offers no evidence that Chase followed through on a foreclosure sale while he was attempting a loan modification. Both the 2009 and 2010 foreclosure sales were cancelled. Chase was under no obligation to give up its rights to foreclosure while considering a modification. The deed expressly provides that the lender's willingness to consider modification or forbearance does not waive the lender's rights or remedies.

Bucci argues next that Chase committed an unfair or deceptive act by appointing NWTS as successor to the original trustee without authority. This is true, according to Bucci, because BofA, not Chase, was the beneficiary of the WaMu Trust in July 2009. Bucci asserts that because Chase was not the beneficiary, Chase lacked authority to appoint NWTS as successor trustee.

Under the DTA, the beneficiary has the power to appoint any trustee that is qualified to act as such pursuant to law. RCW 61.24.010(2). But "only a proper beneficiary has the power to appoint a successor to the original trustee named in the deed of trust." Bavand v. OneWest Bank, F.S.B., 176 Wn. App. 475, 486, 309 P.3d 636 (2013). "[W]hen an unlawful beneficiary appoints a successor trustee the putative trustee lacks the legal authority to record and serve a notice of trustee's sale. Walker v. Quality Loan Serv. Corp., 176 Wn. App. 294, 306, 308 P.3d 716 (2013). "Such actions by the improperly appointed trustee . . . constitute 'material violations of the DTA.'" Rucker v. Novastar Mortg., Inc., 177 Wn. App. 1, 14, 311 P.3d 31 (2013) (quoting Walker, 176 Wn. App. at 308).

Chase acquired Washington Mutual's assets on September 25, 2008, including its servicing obligations for the WaMu Trust. On January 29, 2009, BofA executed a limited power of attorney in favor of Chase authorizing Chase to, among other things, complete a nonjudicial foreclosure and appoint a successor trustee to serve under the deed. Thus, while BofA was the beneficiary of Bucci's note in July 2009, Chase was acting as BofA's agent and attorney-in-fact with the express authority to appoint a successor trustee.

While Bucci agrees that the DTA allows the use of agents, he asserts that the DTA "does not allow an agent to appoint a successor trustee." We disagree. In Bain, our Supreme Court held that "nothing in this opinion should be construed to suggest an agent cannot represent the holder of a note," and that "Washington law, and the deed of trust act itself, approves of the use of agents." 175 Wn.2d 83, 106, 285 P.3d 34 (2012). In July 2009, BofA was the holder of the note and the beneficiary under the DTA. BofA was entitled to initiate foreclosure proceedings. BofA also had authority to appoint Chase as its agent and attorney-in-fact. As BofA's agent, Chase had the authority to appoint a successor trustee to carry out the nonjudicial foreclosure.

Summary judgment dismissing Bucci's CPA claims against Chase was appropriate as Bucci failed to demonstrate an unfair or deceptive act.

C.

Bucci argues that NWTS and RCO committed an unfair or deceptive act by (1) violating the DTA and relying on an ambiguous beneficiary declaration to initiate nonjudicial foreclosure in violation of RCW 61.24.070(7)(a); and (2) violating its duty of good faith by failing to conduct a cursory investigation. We disagree.

RCW 61.24.010(4) imposes a duty of good faith on the trustee toward the borrower, beneficiary, and grantor. See RCW 61.24.010(4). The Lyons court confirmed that the duty of good faith requires the trustee to "remain impartial and protect the interests of all the parties." Lyons, 181 Wn.2d at 787. "[T]he trustee in a nonjudicial foreclosure action has been vested with incredible power. Concomitant with that power is an obligation to both sides to do more than merely follow an unread statute and the beneficiary's directions." Klem v. Washington Mutual Bank, 176 Wn.2d 771, 791, 295 P.3d 1179 (2013). "A foreclosure trustee must 'adequately inform' itself regarding the purported beneficiary's right to foreclose, including, at a minimum, a 'cursory investigation' to adhere to its duty of good faith." Lyons, 181 Wn.2d at 787 (quoting Walker, 176 Wn. App. at 309-10. "A trustee does not need to summarily accept a borrower's side of the story or instantly submit to a borrower's demands. But a trustee must treat both sides equally and investigate possible issues using its independent judgment to adhere to its duty of good faith." Lyons, 181 Wn.2d at 787. A trustee's failure to act impartially can support a CPA claim. Klem, 176 Wn.2d at 792.

1.

Bucci argues first that NWTS violated RCW 61.24.070(7)(a) by relying on an ambiguous beneficiary declaration.

RCW 61.24.030(7)(a) requires a trustee have proof that the beneficiary is the owner of any promissory note before recording the notice of trustee's sale. "Although ownership can be proved in different ways, the statute itself suggests one way: 'A declaration by the beneficiary made under the penalty of perjury stating that the beneficiary is the actual holder of the promissory note . . . shall be sufficient proof as

-21-

required under this subsection.'" Lyons, 181 Wn.2d at 789-90 (quoting RCW 61.24.030(7)(a)).

In Lyons, our Supreme Court held that a successor trustee could not rely on an ambiguous beneficiary declaration that states an entity either held the note or had authority under RCW 62A.3-301 to enforce the note. Lyons, 181 Wn.2d at 791. The beneficiary declaration in Lyons read, "Wells Fargo Bank, NA, is the actual holder of the promissory note or has requisite authority under RCW 62A.3-301 to enforce said obligation." Lyons, 181 Wn.2d at 780 (emphasis added). Strictly construing RCW 61.24.030(7), the court found the declaration ambiguous on its face as it did not prove whether "Wells Fargo is the holder, or whether Wells Fargo is a nonholder in possession or person not in possession who is entitled to enforce." Lyons, 181 Wn.2d at 791.

It is undisputed in this case that the July 30, 2009, beneficiary statement provided to NWTS suffered from the same defect as the declaration in Lyons. The declaration read "Bank of America, National Association as successor by merger to "LaSalle Bank NA as trustee for WaMu Mortgage Pass-Through Certificates Series 2007-0A6 Trust is the actual holder of the promissory note or other obligation evidencing the above-referenced loan or has requisite authority under RCW 62A.3-301 to enforce said obligation." (Emphasis added.) Thus, if NWTS had relied solely on the July 30, 2009, equivocal beneficiary declaration, Bucci would be correct—that NWTS violated the DTS.

The Lyons court, however, noted that the trustee could still comply with RCW 61.24.030(7)(a) by relying on evidence other than the equivocal beneficiary declaration.

-22-

Lyons, 181 Wn.2d at 791. Similarly, in Trujillo v. Northwest Trustee Services, Inc., 183 Wn.2d 820, 828, 833-34, 355 P.3d 1100 (2015), the court reviewed a similarly defective ambiguous beneficiary declaration. But, while the declaration in Trujillo failed to satisfy RCW 61.24.030(7)(a), the Court remanded with instructions that the borrower "have the opportunity to prove that the [trustee] actually relied on the impermissibly ambiguous declaration as a basis for issuing the notice of trustee's sale." Trujillo, 183 Wn.2d at 834.

Here, there is adequate evidence to demonstrate that NWTS possessed information that satisfied RCW 61.24.030(7)(a)'s proof requirement before issuing its 2009 Notice of Trustee's Sale. First, NWTS received a foreclosure referral through a secure messaging platform on June 26, 2009, that identified BofA of WaMu Trust as the foreclosing entity.[12] Along with the referral NWTS received a copy of the note, indorsed in blank. Second, NWTS obtained a trustee's sale guarantee dated June 23, 2009, from First American that identified BofA of the WaMu Trust as the owner of Bucci's Note. Third, Chase, as attorney-in-fact for BofA of the WaMu Trust appointed NWTS as successor trustee of Bucci's deed on July 10, 2009. Fourth, an assignment of deed of trust was recorded in King County on July 10, 2009, that identified BofA of the WaMu Trust as the beneficiary of Bucci's note. The appointment unambiguously states that BofA "is the owner and holder of the obligation secured by the subject deed of trust and

---

[12] Mr. Stenman, NWTS's Vice President and Director of Operations, stated in a declaration that the secure-messaging system is "routinely relied upon in the course of [NWTS's] business as containing accurate information." CP at 1286.

is not holding the same as a security for a different obligation." On July 30, 2009,

Chase, the attorney-in-fact for BofA, issued the ambiguous beneficiary declaration.[13]

Even with the lacking beneficiary declaration, it is clear from the record before us

that NWTS had sufficient proof of the foreclosing beneficiary's identity prior to serving its

first notice of trustee's sale on August 13, 2009.[14]

2.

Bucci asserts that NWTS committed an unfair or deceptive act when it violated its

duty of good faith under RCW 61.24.010(4) by failing to perform a "cursory

investigation" into whether Chase was BofA's attorney-in-fact and whether BofA or USB,

were in fact proper beneficiaries. Other than citing Lyons and Walker, Bucci provides

no argument in support of his contention.

In Lyons, there was evidence Lyon's attorneys repeatedly communicated with

Wells Fargo and NWTS and informed them of significant errors and conflicting

information before the nonjudicial foreclosure. Cf. Lyons, 181 Wn.2d at 787-88. Here,

Bucci never contacted NWTS. But even if Bucci had notified NWTS of improprieties, it

is clear that NWTS would not have breached its duty of good faith by proceeding with

the foreclosure process. NWTS possessed reliable information showing that Chase

was the attorney-in-fact for BofA and that BofA and USB were the beneficiaries of the

---

[13] At the time the declaration was issued, Lyons had not been decided. NWTS only learned that the beneficiary declaration was ambiguous after the Lyons opinion was published in 2014.

[14] After NWTS issued its first notice of trustee's sale, evidence that BofA as trustee of the WaMu Trust was the beneficiary of Bucci's note, continued to accrue. First, On September 9, 2013, First American issued an indorsement to its June 23, 2009, trustee's sale guarantee that confirmed—again— BofA as Trustee of the Loan Trust as beneficiary. Second, prior to issuance of the third notice of trustee sale, NWTS was informed that USB became the successor in interest to BofA as trustee of the WaMu Trust. Finally, on July 7, 2011, NWTS received screenshots from Chase's electronic records that identified USB as trustee of the WaMu Trust as the beneficiary of the note.

note prior to issuing the notices of trustee sale. Here, NWTS met its duty of good faith under RCW 61.24.010(4).

Summary judgment dismissing Bucci's CPA claims against NWTW and RCO was appropriate as Bucci failed to demonstrate an unfair or deceptive act.

III.

Bucci next assigns error to the dismissal of his negligence claims against all the respondents. Bucci argue that the respondents had a duty to use reasonable care because they created a risk of harm when they made "errors, misrepresentations, and omissions . . . during the loan modification and nonjudicial foreclosure." Bucci relies solely on his alleged violations of the DTA and CPA to demonstrate the duty of care. Bucci does not argue the elements of breach, causation, or damage.

Because Bucci does not argue independent grounds for negligence, and his claims against respondents for violations of the DTA and CPA fail, his negligence claims similarly fail. Summary judgment dismissing Bucci's negligence claims was appropriate.

IV.

After the trial court dismissed Bucci's claims against Chase on summary judgment, the trial judge granted in part and denied in part Chase's motion to dismiss based on its argument that Bucci's claims were preempted by the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C. §§ 1461-1468. Bucci assigns error to the trial court's decision.

Because the trial court was correct in dismissing Bucci's underlying claims against Chase under the CPA and for negligence, we decline to address whether Bucci's claims were also preempted by HOLA.

V.

Bucci's amended complaint and appeal included RCO, NWTS's law firm, as a party. NWTS asks us to sanction Bucci for including RCO as a party on appeal.

Washington Rules of Appellate Procedure 18.9 allows this court to order a party or counsel who files a frivolous appeal to pay terms or compensatory damages to this court or any other party who has been harmed by the failure to comply. "An appeal is frivolous if there are no debatable issues upon which reasonable minds might differ, and it is so totally devoid of merit that there was no reasonable possibility of reversal." Lee v. Kennard, 176 Wn. App. 678, 692, 310 P.3d 845 (2013). "RAP 18.9(a) does not speak in terms of filing one or more frivolous issues or assignments of error—only a frivolous appeal as a whole." Lee, 176 Wn. App. at 693.

Here, while Bucci did not assign error to the trial court's grant of summary judgment to RCO, and neglected to address RCO's liability, the appeal, when considered as a whole, is not frivolous. We decline to impose sanctions.

The trial court's decision granting summary judgment in favor of the respondents is affirmed.

_Mann, J._

WE CONCUR:

-26-