**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| WASHINGTON STATE NURSES ASSOCIATION, UFCW 3000 and SEIU HEALTHCARE 1199NW on behalf of certain of the employees they represent,<br><br>Respondent,<br><br>v.<br><br>MULTICARE HEALTH SYSTEM,<br><br>Appellant. | No. 84660-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

DÍAZ, J. — After a hack of its payroll system, MultiCare Health System (MultiCare) implemented a "business continuity plan," which resulted in overpaying some of its employees. MultiCare sought to recover those overpayments pursuant to WAC 296-126-030, which permits an employer unilaterally to recoup overpayments if the overpayments were "infrequent" and "inadvertent." The Unions representing MultiCare's employees sued, claiming MultiCare violated that regulation, and the trial court granted summary judgment in their favor. We reverse because there are genuine issues of material fact as to whether the overpayments were "infrequent" and "inadvertent" in at least one sense of each of those defined terms. We further hold that federal law does not preempt the Unions' claims, nor

No. 84660-4-I/2

are the Unions estopped by positions they took in prior proceedings.  We, thus, remand this matter to the trial court for further proceedings.

I.      FACTS

A.      Factual background

MultiCare is a not-for-profit health care system operating several health care facilities throughout Washington.  MultiCare has approximately 20,000 employees.  Many of MultiCare's employees are unionized.[1]  During the time in question, MultiCare utilized a payroll system from Ultimate Kronos Group, Inc. (Kronos), which integrates an employee's claimed hours of work with MultiCare's payroll process.  The Kronos system calculates a given employee's pay based on the hours the employee claims (and their supervisor confirms) they worked, and the applicable rate of pay.  Using Kronos' data, MultiCare issued payments to approximately 19,500 employees on a bi-weekly basis.

On December 12, 2021, Kronos was subject to a criminal ransomware attack.[2]  For eight weeks, Kronos was inoperable.  Kronos' inoperability meant that MultiCare was unable to calculate the hours its employees worked or rate of pay in the manner it had previously.

In response, while Kronos was inaccessible, MultiCare continued to pay its

---

[1] MultiCare employees are represented by Washington State Nurses Association, Service Employees International Union Local No. 1199NW, and United Food and Commercial Workers Local No. 3000.  For simplicity's sake, we refer to them as the "Unions" throughout this opinion.

[2] MultiCare did not discuss the specific nature of the ransomware attack except that it rendered Kronos inoperable.  Generally, a ransomware attack involves "malware that requires the victim to pay a ransom to access encrypted files." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/ransomware (last visited Aug. 28, 2023).

employees, not based on the hours they claimed they worked, but generally based upon what they earned in the previous pay period immediately before Kronos was attacked. Specifically, MultiCare's "business continuity plan" consisted, first, of paying employees an amount equal to the gross pay (minus one-time payments and taxes) they received on the last paycheck before the Kronos outage. That pay period covered November 21 to December 4, 2021, and included the Thanksgiving holiday. An employee attested that "MultiCare expected that, by this method, each employee would either receive the correct payment, be overpaid, or be underpaid." MultiCare implemented this system for four (4) two-week pay periods, namely, between December 5, 2021 and January 29, 2022.

As a second part of its business continuity plan, MultiCare directed employees temporarily to enter their time in a different program (TimeStamp). MultiCare advised its employees that, when Kronos was back online, MultiCare would "true-up" (or "reconcile") an employee's pay by comparing the time logged in TimeStamp and how much an employee had already been paid. It stated, "*it is possible that some staff may receive more or less pay as an advance than they are actually owed during downtime*. . . . This means that [a hypothetical employee's future] paycheck(s) will be lower [or higher] to account for the fact that he received more pay than what was owed to him during downtime." MultiCare communicated a similar message to its employees several times during the Kronos outage.

In late January 2022, after Kronos became usable again, MultiCare began its "true-up" process. Where an employee was owed funds, MultiCare paid the

3

employee the balance owed between February 8 and 14, 2022. And on February 17, 2022, MultiCare emailed employees who had been overpaid, notifying them that they had been overpaid and how it would recoup the overpayments. MultiCare indicated it would deduct amounts from subsequent paychecks until the overpayments were recovered, starting on March 18, 2022.[3]

The three unions representing MultiCare employees sought to bargain the effects of the implementation of the true-up or "adjustment" process. MultiCare contended (at that time) that state law required it to begin recouping the overpayments by March 18, 2022, i.e., within 90 days of its discovery. By that date, MultiCare made its first deduction from employee paychecks to recoup the overpayments resulting from the Kronos outage.

B.      Subsequent procedure

The Unions filed unfair labor practice charges (ULP) with the National Labor Relations Board (NLRB), and also sought a Temporary Restraining Order in King County Superior Court.[4] The Unions sought injunctive and declaratory relief, in part for the court to declare MultiCare violated WAC 296-126-030. MultiCare

---

[3] Employees owing $500 or less would have the entire amount deducted from their March 18 paycheck. For those owing more than $500, MultiCare planned to withhold up to 25 percent of the overpayment amount from each subsequent paycheck until the balance was paid. Id. Later, MultiCare offered to withhold as low as 10 percent of the total overpayment from a given paycheck. As explained further below, for purposes of this appeal, specific questions about MultiCare's calculation of individual employee's paychecks (e.g., whether, how much, or how frequently it made overpayments) are unrelated to the issue of whether MultiCare complied with, or may avail itself of, WAC 296-126-030. Thus, we do not examine such details further.

[4] At the time of briefing, the NLRB had not acted upon the Unions' ULPs. As will be explained further, below, this matter is distinct from and unaffected by any NLRB decision regardless.

removed the action to the U.S. District Court for the Western District of Washington, arguing the Unions' claims were preempted by federal law.

The U.S. District Court disagreed and granted the Union's request to remand the case back to superior court on the sole question of whether MultiCare's adjustments complied with WAC 296-126-030.

Upon remand, in the King County Superior Court, MultiCare and the Unions filed cross-motions for summary judgment. The trial court granted the Unions' motion for summary judgment and denied that of MultiCare, finding:

> Inadvertent and infrequent has to mean something other than systematically paying thousands of employees on a regular basis . . . they can't simply use the adjustment mechanism that exists in the regulation with -- on this kind of a scale because it's not inadvertent and it's not infrequent. It doesn't meet the definitions of those terms as set forth in the regulation.

MultiCare timely appeals.

## II. ANALYSIS

### A. Motion for summary judgment

#### 1. Law

##### a. Standard of Review

Summary judgment orders are reviewed de novo, and the appellate court performs the same inquiry as the trial court. Jones v. Allstate Ins. Co., 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). The court considers the facts and inferences in the light most favorable to the nonmoving party. Id. The court may grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Id.

"Summary judgment 'is subject to a burden-shifting scheme.'" Welch v.

No. 84660-4-I/6

Brand Insulations, Inc., ___Wn. App___, 531 P.3d 265, 269 (2023) (quoting Bucci v. Nw. Tr. Servs., Inc., 197 Wn. App. 318, 326, 387 P.3d 1139 (2016)).  "The moving party bears the initial burden 'to prove by uncontroverted facts that there is no genuine issue of material fact.'"  Id. (quoting Jacobsen v. State, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977)).

"If the moving party satisfies its burden, then the burden shifts to the nonmoving party to 'set forth specific facts evidencing a genuine issue of material fact for trial.'"  Id. (quoting Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995)).  "If, however, the moving party does not satisfy its initial burden of proof, 'summary judgment should not be granted, regardless of whether the nonmoving party has submitted affidavits or other evidence in opposition to the motion.'"  Id. (quoting Hash v. Children's Orthopedic Hosp. & Med. Ctr., 110 Wn.2d 912, 915, 757 P.2d 507 (1988)).

"Put another way, summary judgment 'should be granted only if, from all the evidence, a reasonable person could reach only one conclusion.'"  Id. (citing to Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)).

b.  Interpretation of Regulations and WAC 296-126-030

The meaning of a statute is a question of law determined de novo.  Durant v. State Farm Mut. Auto. Ins. Co., 191 Wn.2d 1, 8, 419 P.3d 400 (2018).  The court's objective in determining what a statute means is to ascertain and carry out the legislature's intent.  Id.  "If the statute's meaning is plain on its face, then courts must give effect to its plain meaning as an expression of what the legislature intended.  A statute that is clear on its face is not subject to judicial construction."

No. 84660-4-I/7

Id.

Regulations are interpreted similarly. Id. The court "construes the act as a whole, giving effect to all of the language used. If a regulation is unambiguous, intent can be determined from the language alone, and the court will not look beyond the plain meaning of the words of the regulation." Id.

Under RCW Title 49, the Industrial Insurance Act, the Washington State Department of Labor and Industries (L&I) "'has the authority to supervise, administer, and enforce all laws pertaining to employment, including wage and hour laws,'" including the authority to adopt rules implementing state laws setting standards for the payment of wages. Mynatt v. Gordon Trucking, Inc., 183 Wn. App. 253, 260, 333 P.3d 442, (2014) (quoting Schneider v. Snyder's Foods, Inc., 116 Wn. App. 706, 717, 66 P.3d 640 (2003)); see also, e.g., RCW 49.48.087.

At issue here, certain Washington state employers are allowed to recover unilaterally an "overpayment" in certain situations. WAC 296-126-030; see also WAC 296-126-001 (citing applicability and statutory authority). Namely, an "overpayment" occurs when an employer (as defined in Chapter 49.12 RCW) pays an employee for "(a) More than the agreed-upon wage rate; or (b) More than the hours actually worked." WAC 296-126-030(1); see also WAC 296-126-030(10) (indicating that this provision does not apply to public employees). And, the employer can recover (a.k.a., "recoup" or "adjust") an overpayment from an employee's paycheck, in addition to other conditions,[5] only if "the overpayment

---

[5] Those other conditions are contained in WAC 296-126-030(3) (excluding overpayments "when the disputed amount concerns the quality of work"), (4) (requiring the employer "to detect and implement a plan with the employee to

7

was *infrequent and inadvertent*."  WAC 296-126-030(4) (emphasis added).

That WAC further defines those two terms as follows: "[i]nfrequent means rarely, not occurring regularly, or not showing a pattern," and, "[i]nadvertent means an error that was accidental, unintentional, or not deliberately done."  Id.  In other words, there are three definitions of "infrequent" – (1) rarely, (2) not occurring regularly, and (3) not showing a pattern – and three definitions of "inadvertent" – (1) accidental, (2) unintentional, and (3) not deliberately done."  Moreover, "[t]he burden of proving the inadvertent error rests with the employer who made the error."  Id.

This is a case of first impression as no prior appellate court has analyzed the meaning and application of the the terms "infrequent" or "inadvertent" under this regulation.

2.  Discussion

As they conceded at oral argument, to affirm summary judgment in their favor, we must conclude that the Unions have established that, as a matter of law, MultiCare's overpayments do not fall within any of the regulation's three definitions of "infrequent" *or* within any of its three definitions of "inadvertent."  Wash. Court of Appeals oral argument, WSNA et al. v. MultiCare Health System, No. 84660-4-I (July 19, 2023) at 9 min., 7 sec. through 10 min., 17 sec. (on file with court).  In contrast, to repel summary judgment, MultiCare, as they acknowledged, need only

---

collect the overpayment" within 90 days), (6) (requiring written notice), (7) (requiring documentation), and (8) (requiring identification and recording of all wage adjustments "openly and clearly in employee payroll records").  None of these conditions are at issue in this appeal.

show that there is a genuine issue of material fact as to whether its overpayments fall within *one* of the regulation's three definitions of "infrequent" *and* within one of its three definitions of "inadvertent." Wash. Court of Appeals oral argument, <u>supra</u> at 2 min., 21 sec. through 3 min., 5 sec.

In other words, for this court to affirm summary judgment, the Unions have to show that none of the three definitions in at least one of the two terms applies as a matter of law. If the Unions show, for example, that none of the definitions of "infrequent" is applicable, then MultiCare would not be able to show its overpayments were *both* infrequent *and* inadvertent.

We conclude that the Unions did not show there was no issue of material fact regarding *each* of the definitions of either infrequent or inadvertent.

     a. Infrequent

Again, "[i]nfrequent means rarely, not occurring regularly, or not showing a pattern." WAC 296-126-030(4). While the WAC defines "infrequent," it does not define the underlying definitional terms. "When a statutory term is undefined, the words of a statute are given their ordinary meaning, and the court may look to a dictionary for such meaning." <u>Lake v. Woodcreek Homeowners Ass'n</u>, 169 Wn.2d 516, 528, 243 P.3d 1283 (2010) (quoting <u>State v. Gonzalez</u>, 168 Wn.2d 256, 263, 226 P.3d 131 (2010)).

In pertinent part, "rarely" is an adverb, modifying a verb (an action or state of being) that occurs "not often" or only "seldom[ly]." MERRIAM-WEBSTER ONLINE DICTIONARY https://www.merriam-webster.com/dictionary/rarely (last visited Aug. 29, 2023). The terms "seldomly" and "often," thus, invoke a historical or temporal

No. 84660-4-I/10

sense of "infrequently": something that is uncommon over time in the ordinary course of events.

MultiCare first argues that the overpayments were "rare" because the *ransomware attack* was a one-time, first-ever criminal incident. See, e.g., Br. of App. at 21. In support, MultiCare cites, inter alia, to an unpublished 11th Circuit case, where the court held that a driver's use of a car two to three times per month was not considered "continual." Id. at 22 (citing Geico Indem. Co. v. Nelson, 448 Fed. Appx. 925, 927 (11th Cir. 2011)). According to MultiCare, its overpayments, when viewed as a response to this "one causal stimulus," should be seen as "infrequent." Id. We find this argument unpersuasive because the plain language of the statute here requires this court to focus on the "infrequency" of the *overpayments* themselves, not what may have prompted them.

MultiCare next argues that the overpayments were "rare" because this was the first time such overpayments—when viewed either as one event, or as a total of four overpayments "over multiple payroll periods" per employee—ever occurred In part,[6] MultiCare cites to a later part of the regulation that implies that the

---

[6] MultiCare also cites to a Fifth Circuit case, finding that 17 erroneous deductions from an employee's paycheck over a four-month period did not preclude the employer from availing itself of the federal "window of correction" doctrine to remedy the errors, and not lose those salaried employees' exempt status. Br. of App. at 25 (citing Moore v. Hannon Food Service, 317 F.3d 489, 497-98 (5th Cir. 2003)). This argument is unpersuasive because the federal regulation under interpretation in that case (29 C.F.R. § 541.118(a)(6)) contains different *substantive* measures of compliance than the WAC here. Specifically, the federal rule does not contain, as the WAC does, the term, or even concept of, "infrequently," which the federal court thus had no reason to analyze, define, or apply. Instead, the federal regulation requires the deduction to be "inadvertent, or is made for reasons other than lack of work," and the employer must "reimburse[]

10

overpayments need not occur only one time to remain "rare." Specifically, MultiCare cites to WAC 296-126-030(4), which requires employers to detect the overpayments, and implement a plan with the employee to collect the overpayment, within 90 days from the "*initial* overpayment" to avail themselves of this regulation, assuming all the remaining conditions are met. Id. (emphasis added).

The Unions respond that the 80,000 payments (four pay periods to approximately 19,500 people) "were wide-reaching and systemic" and thus not "rare." The Unions otherwise cite to no case law or authority, and do not respond to the regulation's suggestion that, while there may be multiple overpayments (i.e., from the "initial overpayment"), an employer may still avail themselves of this regulation. They simply state because the payments were "widespread" they were not rare.

More substantively, the Unions are focusing on a numerical sense of "infrequency"—one which emphasizes the sheer number or breadth of the overpayments, a large number due to the large number of employees. That focus, however, does not capture the plain language of the full definition of "infrequent." We must "construe[] the act as a whole, giving effect to all of the language used." Durant, 191 Wn.2d at 8; Koenig v. City of Des Moines, 158 Wn.2d 173, 182, 142 P.3d 162 (2006) (where different terms are used in a statute, courts "presume a different meaning for each term"). Thus, while the Unions may be correct about

the employee for such deductions and promise[] to comply in the future." 29 C.F.R. § 541.118(a)(6). The analysis is thus inapposite.

11

the "numerosity" of the overpayments, the Unions' argument ignores the temporal sense of "rarity."

By way of analogy, the recent pandemic is an event that resulted in numerous deaths in a broad range of communities. But, the event was still rare in the sense that it has not occurred "often," at least as measured by living memory. Thus, while there were numerous and "widespread" overpayments, it is still a question of fact for the jury to decide whether the overpayments—conceived either as one set, or as four overpayments per employee, over a two-month time period is "rare" in the temporal sense, i.e., not occurring "often."

Furthermore, we agree with MultiCare that a plain reading of the regulation's suggestion that an overpayment need not be singular supports its argument that a reasonable person could find that four such payments were still "rare."[7]

For these reasons, we hold that MultiCare has "'set forth specific facts evidencing a genuine issue of material fact for trial'" as to whether its overpayments were infrequent in the sense of being "rare." Welch, 531 P.3d 269 (quoting Schaaf, 127 Wn.2d at 21). To be clear, this conclusion is so because the burden is on the Unions on their summary judgment motion to show that *no*

---

[7] Further support for this position is found in one of the examples in the regulation. Namely, example 3 describes a hypothetical situation in which an employer could not avail itself of the regulation because it did not detect "overpayments" until six months after "the first occurrence" of an overpayment because, as reviewed above, detection and implementation of a recoupment plan must occur within 90 days. WAC 296-126-030. It is a reasonable inference that the contrary is true: had the employer detected the overpayments in less than ninety days it could have availed itself of an allowable adjustment. For our purposes, it seems clear that multiple overpayments over multiple months (in the example, three months) would not prevent a fact finder from finding the overpayments "rare."

12

genuine issue of material fact remains. Jones, 146 Wn.2d at 300-01. Our conclusion does not mean that MultiCare has demonstrated, as a matter of law, what it must to prevail at trial, simply that there is enough of a factual question to preclude summary judgment.[8]

b. Inadvertent

Again, WAC 296-126-030(4) defines inadvertent as: "an error that was accidental, unintentional, or not deliberately done." Thus, as to this element, MultiCare may recover an overpayment from, or "adjust," an employee's paycheck unilaterally "provided the overpayment" was, in pertinent part, "unintentional" or "not deliberately done." Id.[9] And to reiterate, the Unions must show no genuine issue of material fact as to whether MultiCare's collection was neither unintentional nor deliberately done. We conclude there is a genuine issue of material fact as to whether MultiCare's overpayments were intentional or "deliberately done," such that a reasonable person could reach more than one conclusion.

We review the meaning of "inadvertent" similarly to "infrequent," where if a term is undefined, "the words of a statute are given their ordinary meaning, and the court may look to a dictionary for such meaning." Lake, 169 Wn.2d at 528. And again, the underlying definitional terms are undefined.

"Unintentional" means "not done by intention or design : not intentional." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/unintentional (last visited Aug. 29, 2023). "Intention"

---

[8] We need not and thus do not reach whether MultiCare has established a genuine issue of fact as to "irregularity" or whether the overpayments evidenced a "pattern."
[9] MultiCare does not seriously argue that the overpayments were "accidental."

13

means "what one intends to do or bring about." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/intention. "Deliberately" means "in a deliberate manner: such as **:** with *full awareness* of what one is doing **:** in a way that is intended or planned." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/deliberately (last visited Aug. 29, 2023) (emphasis added). And, finally, "deliberate" means "characterized by awareness of the consequences." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/deliberate (last visited Aug. 29, 2023).

As to intentionality, MultiCare offered unrebutted evidence that when issuing the overpayments, it contemporaneously stated it did not know whether any given employee would be underpaid, overpaid, or paid correctly. Further, when MultiCare made all payments (not just overpayments) to its employees, it expressly advised them it may need to later adjust these payments to account for any amounts—lower or higher—inadvertently paid during the outage period.

Together these facts could lead a reasonable trier of fact to conclude that MultiCare's intent in issuing the payments was simply to pay its employees on the regular schedule and in approximately the right amount. In other words, MultiCare's intent was to get *some kind of* payment to its employees, notwithstanding whether it resulted in an overpayment or an underpayment. It certainly did not wish "to bring about" an overpayment. Therefore, there is at least a question of fact as to whether the overpayment was "unintentional" and thus

No. 84660-4-I/15

inadvertent.[10]

As to deliberateness, the Unions contend that because the pay period immediately preceding the Kronos hack included Thanksgiving—which often includes holiday incentive pay—MultiCare knew it was highly likely subsequent paychecks would reflect a higher than usual payment to the employee. Thus, MultiCare had "full awareness of what one is doing in a way that is intended or planned."

This too, however, is a question of fact. MultiCare adduced evidence that, due to its "sheer size, it was not feasible to record time by hand and manually compute each employee's complicated pay schedule for each employee for each period." Without such information, a reasonable juror could find that MultiCare did not know what the actual correct pay for any employee was, particularly with respect to a category of casual employees. Further, there is evidence in both directions as to whether MultiCare knew or merely suspected some overpayments may occur.

For these reasons, it is an issue of material fact whether MultiCare had "full awareness" both about the possibility of overpayments in general and about details

---

[10] We do not necessarily conclude that the overpayments were "unintentional" as a matter of law, however. MultiCare also has argued that there "existed no practical (or indeed, possible) way for MultiCare to calculate the payments owed in wages to each of its nearly 20,000 employees affected by the outage." This is an issue of fact for the jury to decide. Should a jury, for example, decide that MultiCare chose the least expensive or burdensome option in an array of options, *knowing* there likely would be an overpayment (although the more costly option may have avoided such overpayments), then a reasonable jury could conclude it chose that option "intentionally," i.e., "by design."

15

of any overpayments of any particular employee.[11]  Therefore, we reverse the trial court's order of summary judgment because the Unions did not meet their burden of showing no genuine issue of material fact exists as to whether MultiCare's overpayment collection was "inadvertent" under the WAC.  A jury must determine this question.

B.     Preemption or estoppel of state law claim

MultiCare argues that the Unions are estopped from bringing their claim under WAC 296-126-030 and are preempted by the Garmon doctrine from bringing this state law claim in state court.

Further procedural history is relevant.  After the Unions sought a temporary restraining order in federal district court, MultiCare argued that the court should dismiss the claim because it was preempted by federal law.  The district court disagreed, finding the Unions' claims under WAC 296-196-030 were distinct from any interpretation of its various collective bargaining agreements (CBA), and thus not preempted by federal law.  Specifically, the district court stated:

> MultiCare argues that the Court must determine whether and to what extent "overpayments" occurred to resolve this claim—a task that would require interpretation of the CBAs.
>     But the Unions' claim is not so broad.  They do not ask the Court to determine if overpayments occurred or the amount of those overpayments.  Rather, they ask the Court to determine only the legality of the *method* MultiCare has used—and intends to continue to use—to recoup alleged overpayments.

---

[11] MultiCare offers analogies from a variety of different types of cases.  For example, it turns to various principles of torts, premises liability, and more to argue that a subsequent action taken as a result of an inadvertent event are themselves inadvertent.  Because these examples are well outside of the context of wage-related regulations, we decline to consider them.

16

Stated otherwise, the district court held that "the threshold question is whether the regulatory restrictions prevent MultiCare from making paycheck deductions in the first place." And finally, the court held that, "[w]here, as here, 'the presence of the necessary elements of a state claim can be ascertained without recourse to interpretation of the CBA, the state law remedy is not preempted.'" Id. (citing Shane v. Greyhound Lines, Inc., 868 F.2d 1057, 1062 (9th Cir. 1989)).

1. Estoppel

MultiCare argues that the trial court erred in not estopping the Unions from raising wage dispute issues, which require interpretation of their CBAs, and which the Unions specifically disclaimed during federal court proceedings.

"Judicial estoppel is an equitable doctrine that precludes a party from asserting one position in a court proceeding and later seeking an advantage by taking a clearly inconsistent position." Arkison v. Ethan Allen, Inc., 160 Wn.2d 535, 538, 160 P.3d 13 (2007) (quoting Bartley-Williams v. Kendall, 134 Wn. App. 95, 98, 138 P.3d 1103 (2006)). Our Supreme Court has held:

> Three core factors guide a trial court's determination of whether to apply the judicial estoppel doctrine: (1) whether "a party's later position is 'clearly inconsistent' with its earlier position"; (2) whether "judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

Arkison, 160 Wn.2d at 538-39 (quoting New Hampshire v. Maine, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (quoting United States v. Hook,

195 F.3d 299, 306 (7th Cir. 1999); Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 599 (6th Cir. 1982)).

MultiCare argues that, because some of the declarations from various union members allege discrepancies in their wage adjustments from MultiCare, the Unions are in fact trying to litigate wage disputes governed by their CBAs. MultiCare claims that the mere presence of these declarations is inconsistent with the Unions' statements that they wished to litigate *only* whether MultiCare may avail itself of WAC 296-196-030.

MultiCare does not explain how the content of these declarations warrants judicial estoppel. Applying the Arkison factors, first, the Unions' claim of the violation of WAC 296-126-030 is not inconsistent with its prior statement that it believed it also was entitled to bargain (in another forum) how MultiCare rolled out its paycheck adjustments, including on behalf of individual employees (some of whom may have been underpaid or overpaid). Second, this court's ability to examine a claim under the WAC is distinctly different from the federal court's examination of the right to bargain and to interpret a CBA, a distinction that the federal district court noted. The representations the Unions made in federal court are distinct from those made in this court and, therefore, this court would not be misled by anything stated there, or vice versa. Third, MultiCare does not explain how the Unions would "obtain an unfair advantage" over MultiCare by bringing these declarations. As the Unions represent and will be held to in future proceedings, "[t]he employee declarations were *not* offered to resolve any individual wage disputes that may exist between employees and MultiCare," and

18

this court expressly need not consider and does not reach those issues.

The distinct rights of employees under Washington State law do not disappear because the same employees also have protections under their CBA or various federal laws. For these reasons, we hold that the mere presence of some passing reference to complaints about the specifics of a particular employee's wage does not warrant judicial estoppel in the way MultiCare urges.

2. Preemption

As it did in the federal district court, MultiCare argues that, because the Unions' claim under WAC 296-126-030 pertains to the payment of wages (whose calculation may be determined by a CBA), the Unions should be allowed to pursue a remedy only before the NLRB.

If a union or employer brings a claim before a court that involves rights protected by the National Labor Relations Act (NLRA), the court is preempted from addressing that claim under San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959). Instead, the courts must defer to the expertise of the NLRB. Garmon, 359 U.S. at 245.

Moreover, "[t]he NLRA does indeed preempt state or local laws that create supplemental sanctions for violations of the NLRA. '[T]he Garmon rule prevents States . . . from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the Act.'" Filo Foods, LLC v. City of SeaTac, 183 Wn.2d 770, 801-02, 357 P.3d 1040 (2015) (quoting Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc., 475 U.S. 282, 286, 106 S. Ct. 1057, 89 L. Ed. 2d 223 (1986)).

No. 84660-4-I/20

As the district court noted, however, the Unions' claims under state law are distinct from the claims they brought before the NLRB. Again, the district court held that the Unions "ask the Court to determine only the legality of the *method* MultiCare has used—and intends to continue to use—to recoup alleged overpayments."

"According to MultiCare, it is at least arguable that the Unions' claims regarding WAC 296-126-030 are similar enough to the claims it brought under the NLRA that the former are preempted. MultiCare relies on Kilb v. First Student Transp., LLC, 157 Wn. App. 280, 236 P.3d 968 (2010). In that case, a former employee brought suit alleging he was terminated by his employer for refusing to engage in the company's anti-union efforts. Id. at 284. This court held that federal law preempted a similar state law claim because the state right he invoked was modeled after a similar right in the NLRA. Id. at 284-85.

Here, however, as the district court correctly explained, the Unions are not contesting the substance of the wage dispute (either the amount or its calculation under the CBA), but the *method* by which MultiCare is recovering any overpayment from employees. The Unions' right to bargain the effects of an overpayment, or an employee's right to recover their own underpayment, is distinct from (or at least "peripheral to") the state-law-based method by which an employer may recover overpayments, once the overpayment has been established as valid and collectible under the CBA. Kilb, 157 Wn. App. at 290-91. Again, to resolve the dispute before us, we need not resolve any particular wage dispute or the dispute as to the right to bargain, which is the essential nature of the complaint to the

20

No. 84660-4-I/21

NLRB.  Therefore, the claim before this court is not preempted by federal law.

### III.     CONCLUSION

We reverse the trial court's grant of summary judgment and remand for further proceedings consistent with this opinion.

_Díaz, J._

WE CONCUR:

_Feldman, J._                    _Chung, J._