**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STONEY MEADOWS HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation, | No. 87264-8-I |
| Respondent / Cross-Appellant, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| REID TEN KLEY AND EIKE TEN KLEY, | |
| Appellants / Cross-Respondents. | |

FELDMAN, J. — Stoney Meadows Homeowners Association (the Association) and Reid and Eike Ten Kley (the Ten Kleys) cross-appeal a series of rulings regarding the ownership and use of a "Private Road" and "Reserve Strip" (as defined below) situated in the Stoney Meadows subdivision (Stoney Meadows) in Clark County, Washington. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I

The real estate comprising Stoney Meadows was previously owned by Stoney Meadows, Inc., the Federal Land Bank of Spokane, William D. and Shirley A. Huyette, and Robert W. and Donna R. Roberts. In 1989, they executed a plat dedication creating Stoney Meadows and recorded the corresponding plat (the

Plat) in Book H of Plats, page 454. The Plat depicts the following area of the subdivision relevant to this appeal:



(Cropped from full plat.) This litigation primarily concerns the hatched area between lots 19, 20, and 21—referred to herein as the Private Road—and the reference to "1' reserve strip" and associated arrow at the northern boundary of that road—referred to herein as the Reserve Strip.

Sometime after the Plat was recorded, the Stoney Meadows Joint Venture (Joint Venture) acquired ownership of Stoney Meadows.[1] The Joint Venture executed a Declaration of Covenants, Conditions and Restrictions and Establishment of the Homeowners Association for the Plat of Stoney Meadows (the CC&Rs). The CC&Rs define "Common Area" as "all real property owned by the Association for the common use and enjoyment of the owners" and clarify that

---

[1] Although the record does not contain a deed conveying ownership of Stoney Meadows to the Joint Venture, the parties do not dispute that the Joint Venture acquired ownership of Stoney Meadows (including the Private Road and Reserve Strip) at or around the time the Plat was recorded in 1989.

"[t]he Common Area to be owned by the Association is described as Lot 17/1 of the final Plat of Stoney Meadows Subdivision." The CC&Rs also state each homeowner "shall have a right and easement of enjoyment in and to the Common Areas" and that the Association is responsible for maintaining the Common Areas as "open space for the benefit of all owners."

Thereafter, the Joint Venture began conveying lots in the subdivision to their initial owners. In 1995, the Joint Venture executed a quit claim deed conveying to the Association "Lot 17/1 of Stoney Meadows Subdivision as recorded in Book H of Plats, page 454, Auditor's Number 8905310191" (the Lot 17/1 Deed). Around this same time, the Joint Venture transferred control of the Association to the homeowners. Later, in 1997, the Joint Venture executed a statutory warranty deed conveying to Douglas M. and Janet B. Smith "Lot 20, STONEY MEADOWS, according to the plat thereof, recorded in Volume "H" of plats, page 454, records of Clark County, Washington, TOGETHER with a 54 foot non-exclusive private road and utility easement subject to Lots 19, 20, and 21 as disclosed on the plat deed of Stoney Meadows" (the Lot 20 Deed). Stoney Meadows, Inc. administratively dissolved in December 1998, and the Joint Venture ceased operating by the mid-2000s.

After the homeowners assumed control of the Association, it and other homeowners took various actions with respect to the Private Road. Between 1999 and 2000, the Association paid contractors to pave a portion of the Private Road and add curbs to the paved portion. Additionally, the Association supplies electricity to a streetlamp on the Private Road. The Association began hanging

seasonal holiday decorations on this lamp in 2003, and it installed a fake camera on the pole in 2004. By 2011, the Association had installed a "No Outlet" sign at the entrance to the Private Road and a directional sign on the streetlamp stating that NE 171st Avenue is a "Private Road."

The paved portion of the Private Road ends approximately 107 feet south of the northern boundary of the subdivision, and the parties refer to the unpaved area as the Green Space. Sometime prior to 2017, a barbed wire fence was installed across the width of the Private Road approximately 10 feet from the northern border of the subdivision. In 2002, the owners of lots 20 and 21 agreed to landscape the Green Space and connect it to the Association's irrigation system in exchange for the Association maintaining the Green Space. After the landscaping was completed, the Association paid a contractor to mow the grass in the Green Space weekly between March and October, maintain the trees and shrubs in that area, and maintain the irrigation system. In 2007, the Association's Board of Directors (the Board) voted to stop paying for "maintenance" to the Private Road after determining it was owned by the owners of lots 19, 20, and 21 and was "legally private property rather than common areas as previously believed." In 2009, the Board reversed course and voted to resume paying a contractor to maintain the Green Space.

The Ten Kleys purchased lot 18 in 2017. In 2021, while Reid[2] was a member of the Board, he informed the other members he was planning to purchase approximately 20 acres of land immediately north of Stoney Meadows

---

[2] Because appellants share the same last name, we refer to Reid by his first name for clarity.

(the Northern Property) abutting the Reserve Strip and lots 17/1, 18, 19, and 20. Before purchasing the Northern Property, Reid asked the Association for "permission to use the private road section of NE 171st Ave" to access the Northern Property. Although the Association and Ten Kleys were unable to reach an agreement, the Ten Kleys proceeded with the purchase in early 2022.

In 2022, the Huyettes and Donna R. Roberts executed an agreement (the Easement) that purports to grant the Ten Kleys "a perpetual easement for ingress, egress and utilities over and across the following-described real property." As discussed further in section II.C below, the Easement then describes the subject property by reference to the Plat of Stoney Meadows. The Easement also states that it "is to run with the land and inure to the benefit of" the "Benefitted Property," which it identifies as the Northern Property. After recording the Easement, the Ten Kleys constructed a gravel roadway connecting the paved portion of the Private Road to the Northern Property and have arranged for trucks and other construction vehicles to access the Northern Property using the Private Road.

After learning of the Easement, the Association filed a complaint on March 10, 2023 against the Ten Kleys and all members of the Joint Venture seeking a judgment quieting title to the Private Road and Reserve Strip in favor of the Association, either through the Lot 17/1 Deed or adverse possession, and declaring the Easement null and void. Ten months later, on January 19, 2024, the Association filed a motion for entry of default against the Huyettes, the Roberts, Stoney Meadows, Inc., and the Joint Venture after they each failed to answer the complaint. An attorney representing the Huyettes and the Roberts filed a response

stating these defendants had "no objection to the proposed default order or having a default judgment entered against [them] to remove the cloud of their potential interest from title." On February 16, 2024, the trial court granted the Association's motion and entered orders of default against the Huyettes, the Roberts, Stoney Meadows, Inc. and the Joint Venture.

Meanwhile, the Association and the Ten Kleys (the only defendants who answered the complaint) filed competing motions for summary judgment as to the remaining claims as well as motions for reconsideration concerning the trial court's initial rulings. Additionally, the Association filed a motion for entry of a default judgment against the defendants who had defaulted. Through a series of orders (some of which modified prior orders), the trial court ruled: (1) the Association is not the record owner of the private road via the Lot 17/1 Deed, (2) the Association did not adversely possess the private road, (3) the Easement is valid but only includes the Private Road and does not include the Reserve Strip, and (4) because the Ten Kleys have no interest in the Reserve Strip and the other remaining defendants defaulted, the Association had adversely possessed the Reserve Strip.

Consistent with these orders, the trial court entered a default judgment quieting title to the Reserve Strip in favor of the Association. The order contains findings that the Huyettes and Donna R. Roberts "have affirmatively disclaimed any interest in the Reserve Strip and have stated their willingness to have a default judgment entered against them to remove the cloud of their potential interest from the title of the Reserve Strip." Based on these findings and related conclusions, the court quieted title to the Reserve Strip in favor of the Association. Thus, while

the Ten Kleys prevailed with regard to the Private Road, the Association prevailed with regard to the Reserve Strip.

Both parties appeal.

II

A.    Lot 17/1 Deed

Seeking to undo the trial court's determination that the Easement is valid with regard to the Private Road, the Association argues the trial court erred by concluding the Association did not previously acquire record title to the Private Road via the Lot 17/1 Deed.  The Association asserts, in other words, that the Joint Venture could not have granted an easement over and through the Private Road because any such rights belonged solely to the Association.  Contrary to the Association's argument, the trial court correctly decided this issue.

We review the trial court's summary judgment rulings de novo.  *David v. Freedom Vans LLC*, 4 Wn.3d 242, 248, 562 P.3d 351 (2025).  Summary judgment is governed by "'a burden-shifting scheme.'"  *Welch v. Brand Insulations, Inc.*, 27 Wn. App. 2d 110, 114, 531 P.3d 265 (2023) (internal quotation marks omitted) (quoting *Bucci v. Nw. Tr. Servs., Inc.*, 197 Wn. App. 318, 326, 387 P.3d 1139 (2016)).  "The moving party bears the initial burden 'to prove by uncontroverted facts that there is no genuine issue of material fact.'"  *Id*. at 115 (quoting *Jacobsen v. State*, 89 Wn.2d 104, 108, 569 P.2d 1152 (1977)).  If the moving party meets its burden of showing summary judgment may be appropriate, the burden shifts to the nonmoving party to show "'specific facts evidencing a genuine issue of material fact for trial.'"  *Id*. at 114 (quoting *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d

665 (1995)). To the extent we separately review the trial court's rulings regarding the parties' motions for reconsideration, such rulings are reviewed for an abuse of discretion, which occurs when the decision is manifestly unreasonable or discretion is exercised on untenable grounds or for untenable reasons. *Worden v. Smith*, 178 Wn. App. 309, 322-23, 314 P.3d 1125 (2013).

"Every conveyance of real estate, or any interest therein, and every contract creating or evidencing any encumbrance upon real estate, shall be by deed." RCW 64.04.010. We construe deeds "'to give effect to the intentions of the parties, and particular attention is given to the intent of the grantor.'" *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 64, 277 P.3d 18 (2012) (quoting *Zunino v. Rajewski*, 140 Wn. App. 215, 222, 165 P.3d 57 (2007)). "In general, we determine the intent of the parties from the language of the deed," which "is the best evidence of the intent of the original parties." *Id.* at 64-65. Thus, "where the plain language of the deed is unambiguous, extrinsic evidence will not be considered." *Id.* at 64.

Washington law generally imposes a "strict legal description requirement" for deeds. *Teklu v. Setayesh*, 21 Wn. App. 2d 161, 162, 505 P.3d 151 (2022). Under this rule, "'a document that transfers an interest in land must describe the land by its full legal description' to satisfy the statute of frauds." *Id.* at 165 (quoting 18 WILLIAM B. STOEBUCK & JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: TRANSACTIONS § 13.3, at 78 (2d ed. 2004). This description of the land must be "'sufficiently definite to locate it without recourse to oral testimony, or else it must contain a reference to another instrument which does contain a sufficient

description.'" *Berg v. Ting*, 125 Wn.2d 544, 551, 886 P.2d 564 (1995) (quoting *Bigelow v. Mood*, 56 Wn.2d 340, 341, 353 P.2d 429 (1960)).

A plat is one such "another instrument" to which a deed may refer when describing the conveyed real estate. *See Cook v. Hensler*, 57 Wash. 392, 397, 107 P. 178 (1910) (observing the "general rule . . . that reference to a plat or map in a deed of conveyance makes it a part thereof"). "In construing a plat, the intention of the dedicator controls." *Roeder Co. v. Burlington N., Inc.*, 105 Wn.2d 269, 273, 714 P.2d 1170 (1986). "That intention is to be determined from all the marks and lines appearing on the plat." *Id.* Courts construe plats "'as a whole in order that the intention of the party may be ascertained, and every part of the instrument be given effect" so that "no part of the plat[] is to be rejected as . . . meaningless, if it can be avoided.'" *Cummins v. King County*, 72 Wn.2d 624, 627, 434 P.2d 588 (1967) (quoting 26 C.J.S. *Dedications* § 49 at 519-20). "If the plat is unambiguous, the intent, as expressed in such plat, cannot be contradicted by parol evidence." *Selby v. Knudson*, 77 Wn. App. 189, 194, 890 P.2d 514 (1995).

Here, the Lot 17/1 Deed unambiguously conveyed only Lot 17/1—not the Private Road—to the Association. The Lot 17/1 Deed does not refer to the Private Road but, instead, refers to "Lot 17/1 of Stoney Meadows Subdivision as recorded in Book H of Plats, page 454, Auditor's Number 8905310191." Additionally, the Plat to which the Lot 17/1 Deed refers did not, as the Association claims, "incorporate the Private Road as part of Lot 17/1." As shown on the face of sheet 1 of the Plat, the Private Road is not located in or adjacent to lot 17/1 but is separated from lot 17/1 by lots 18 and 19. And sheet 2 of the Plat—depicting a

larger area of Clark County encompassing the subdivision and surrounding land—separates the subdivision into two relevant areas: (1) "Stoney Meadows lots 1-16 & 18-40" and (2) "lot 17/1 (open space) a tract to be owned in common." When comparing sheets 1 and 2 of the Plat, the Private Road is clearly situated in the first area, which confirms it is not part of lot 17/1.

Had the Joint Venture intended at the time it prepared the Plat for Lot 17/1 to include the Private Road or for the Association to otherwise acquire a present interest in the Private Road, it would have so stated on the Plat. *See Roeder*, 105 Wn.2d at 273-75 (landowner, a railroad company, reserved fee simple title to an 80-foot strip of land by stating in the plat that this land was "Reserved for Railroad"). By stating that the Private Road was "reserved" for "future dedication," the Joint Venture was apparently expressing an intention to retain ownership of the Private Road and convey it "as part of lot 17/1" at some later point in time. But the Joint Venture failed to convey such an interest to the Association via the Lot 17/1 Deed or any other instrument, indicating the Joint Venture did not intend to do so. Based on the unambiguous language of the Lot 17/1 Deed and the Plat to which it refers, the trial court did not err in concluding on summary judgment that the Association did not acquire record title to the Private Road via the Lot 17/1 Deed. The Association's contrary argument thus fails.

B.    Adverse Possession

Next, both parties challenge the trial court's adverse possession rulings. The Ten Kleys, for their part, argue the trial court erred in "awarding title to the reserve strip to the Association" by adverse possession. And the Association, for

its part, claims the trial court erred in concluding it did not adversely possess the Private Road. As explained below, the Ten Kleys' argument is persuasive and the Association's is not; the trial court correctly concluded the Association had not adversely possessed the Private Road but erred in concluding it had adversely possessed the Reserve Strip.

"In order to establish a claim of adverse possession, there must be possession that is: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile." *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989). Additionally, "[p]ossession of the property with each of the necessary concurrent elements must exist for the statutorily prescribed period of 10 years." *Id.* The party claiming to have adversely possessed the property bears the burden of establishing each element by a preponderance of the evidence. *Teel v. Stading*, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010). "Adverse possession is a mixed question of law and fact: whether the essential facts exist is for the trier of fact, but whether the facts constitute adverse possession is for the court to determine as a matter of law." *Lingvall v. Bartmess*, 97 Wn. App. 245, 253, 982 P.2d 690 (1999). Where the essential facts are undisputed, a court may determine as a matter of law whether a claimant has satisfied the elements of adverse possession. *Ofuasia v. Smurr*, 198 Wn. App. 133, 143-44, 392 P.3d 1148 (2017).

1. The Private Road

The Association failed to prove its possession of the Private Road was exclusive. "'[T]he exclusivity element means that an adverse possessor may not share possession of the area claimed with the true owner and, though less critical,

not too much with third persons who are there *without* the adverse possessor's consent.'" *Michel v. City of Seattle*, 19 Wn. App. 2d 783, 790-91, 498 P.3d 522 (2021) (quoting 17 STOEBUCK & WEAVER, REAL ESTATE: PROPERTY LAW § 8.19, at 541). "Adverse possession must be as exclusive as one would expect of a titled property owner under the circumstances." *Harris v. Urell*, 133 Wn. App. 130, 138, 135 P.3d 530 (2006). "Important to a consideration of what use an owner would make are the nature and location of the land." *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). A claimant cannot establish exclusivity where it "fails to negate instances of use by others." *ITT Rayonier*, 112 Wn.2d at 759; *see also* 17 STOEBUCK & WEAVER, *supra*, § 8.19, at 542 ("It seems clear that a general sharing of possession with a group of third persons far smaller than the public, or even with one other person who uses independently from the adverse claimant, can prevent exclusivity.").

Here, the record establishes the Association's possession of the Private Road was not exclusive because it shared possession with innumerable third persons. The owners of lots 19, 20, and 21 use the Private Road to access their lots. Additionally, the record indicates members of the public regularly travel over the paved portion of the Private Road. Although the Association has installed signs near the entrance of the Private Road stating "No Outlet" and "Private Road," these signs do not state that only the Association or its members are allowed to use the Private Road. In contrast, the Association has posted several signs at the entrance to the common area on lot 17/1 stating that only members of the Association are allowed to use the driveway and greenspace on lot 17/1. Moreover, multiple

homeowners testified that they believed they had a right to access the Private Road without first obtaining permission from the Association.

Similarly, the record shows third persons used the Green Space without the Association's permission. As with the paved portion of the Private Road, there were no signs or structures (such as a fence) preventing homeowners or members of the public from accessing the Green Space. Additionally, the developments to the Green Space between 1999 and 2000 were paid for and constructed by the owners of lots 20 and 21—not the Association. Although the Association owns and maintains an irrigation system that supplies water throughout the subdivision, the irrigation system that supplies water to the Green Space was installed by the owners of lots 20 and 21. The record also indicates the owner of lot 20 can decide when to turn off irrigation to the Green Space. This evidence shows that, rather than acquiring exclusive possession of the Green Space, the Association entered into an agreement with the owners of lots 20 and 21 in which those owners agreed to develop the Green Space in exchange for the Association maintaining the area in the future. In short, the Association cannot establish exclusivity over the Private Road because it has not taken steps to prevent anyone—whether members of the Association or the general public—from using that area as they please.

The Association contends "[t]ransitory unpermitted use by third parties cannot defeat the Association's otherwise exclusive possession." In support of this proposition, the Association relies on *Michel*, 19 Wn. App. 2d 783, but that reliance is misplaced. In *Michel*, we held that the city had adversely possessed a tract of land (designated "tract 44") because it "managed the land as a true owner would

under the circumstances," namely by using it for "electrical distribution with power poles" and not "shar[ing] possession . . . with" the true owner. *Id.* at 791. Despite the city having shared possession of the property with third parties, we concluded the city's possession was nonetheless exclusive because it had "manag[ed]" these third parties' uses of the property by "consent[ing] to third persons' uses of tract 44 for road access, recreation, parks, and trails"; "grant[ing] permits" to neighbors "for use of tract 44 to garden and access the road"; and "manag[ing] other third parties' access to and uses of tract 44, including lake access, fishing, and other recreation." *Id.* Unlike the adverse claimant in *Michel*, the Association has not managed or prohibited its members' or the public's use of the Private Road or Reserve Strip.

Next, the Association claims it can establish adverse possession based on the actions of its members—the homeowners in the subdivision—because "it is an entity established for the benefit of members of a community, which can own and maintain real property separate from its members' directly-owned property." Thus, according to the Association, its "'exclusive' use of a Private Road would not be defeated through the routine use by community members, their guests and invitees, or use by the Association's invitees (*e.g.*, landscaping and other maintenance personnel)." We rejected a similar argument in *Timberlane Homeowners' Ass'n v. Brame*, 79 Wn. App. 303, 307, 901 P.2d 1074 (1995). There, a homeowners' association demanded that the homeowners of a lot remove a fence encroaching onto a common area, but the homeowners refused and claimed they had acquired title to the disputed property by adverse possession. *Id.* at 306. The association filed a complaint seeking to quiet title to the common

area and claimed it had standing to file such a complaint based on its declaration of covenants, conditions, and restrictions, which granted every member of the association a right and easement of enjoyment in and to the common areas. *Id.* at 306-07. On appeal, we rejected the association's argument and concluded it lacked standing to "enforce its members' property rights." *Id.* at 309.

Although *Timberlane* did not involve an adverse possession claim brought by a homeowners' association, its reasoning is applicable in the instant dispute. While the CC&Rs allow and require the Association to maintain common areas, it does not authorize the Association to acquire new common areas on its own volition or to maintain an action to enforce its members' rights to enjoy common areas in the subdivision. Notably, the CC&Rs indicate that the *only* common area to be owned by the Association is lot 17/1. The Association has not cited any cases in which a homeowners' association has adversely possessed real estate located in a subdivision. *See Donner v. Blue*, 187 Wn. App. 51, 61, 347 P.3d 881 (2015) ("Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.") (internal quotation marks omitted). At bottom, while the Association acts on behalf of the homeowners in its subdivision, it is a separate legal entity that must establish the elements of adverse possession based on *its* possession of the disputed real estate.

The Association also contends it is entitled to adverse possession by default because the party who purportedly holds fee simple title to the Private Road—the Joint Venture—"did not appear or defend any such interest, and its direct and

indirect members disavowed any interest." But even if a party could establish adverse possession by default (the Association cites no authority so holding), "a trial court is not compelled by the entry of an order of default to subsequently enter a default judgment." *Kaye v. Lowe's HIW, Inc.*, 158 Wn. App. 320, 335, 242 P.3d 27 (2010). Further, it is axiomatic that "[a] party seeking to quiet title must succeed on the strength of its own title, and cannot prevail based on the weakness of the other party's title." *Wash. Secs. & Inv. Corp. v. Horse Heaven Heights, Inc.*, 132 Wn. App. 188, 195, 130 P.3d 880 (2006). Given the above analysis rejecting the Association's two legal bases underlying its claim of title to the Private Road (the Lot 17/1 Deed and adverse possession), the Association's claim of ownership over the Private Road by default fails as a matter of law. The proper method by which the Association may acquire fee simple title to the Private Road from the Joint Venture is by a deed.

Nor are we persuaded by the Association's argument that the Ten Kleys lack standing to oppose its adverse possession claim. "'A party has standing to raise an issue if it 'has a distinct and personal interest in the outcome of the case.'" *Timberlane*, 79 Wn. App. at 307 (quoting *Erection Co. v. Dep't of Labor & Indus.*, 65 Wn. App. 461, 467, 828 P.2d 657 (1992)). As discussed in section II.C below, the Easement is valid (at least with respect to the Private Road). And because the easement granted therein is "perpetual" and "is to run with the land," it "'is not a mere privilege to be enjoyed by the person to whom it is granted or by whom it is reserved. It passes by deed of such person to his grantee and follows the land without any mention whatever.'" *Heg v. Alldredge*, 157 Wn.2d 154, 161, 137 P.3d

9 (2006) (quoting *Winsten v. Prichard*, 23 Wn. App. 428, 431, 597 P.2d 415 (1979)) (internal quotation marks omitted). As discussed below, the Ten Kleys were granted an interest in at least some of the real estate to which the Association seeks to acquire ownership, and granting the Association's requested relief would deprive the Ten Kleys of that property interest. For these reasons, the trial court correctly rejected the Association's adverse possession claim with respect to the Private Road and granted summary judgment in favor of the Ten Kleys on that issue.

2.      The Reserve Strip

The Association's adverse possession claim as to the Reserve Strip fails on a more fundamental level, which is that it has not established a genuine issue of material fact as to whether it possessed the Reserve Strip at all. "'[I]t is not possible to be in adverse possession without physical occupation . . . .'" *Michel*, 19 Wn. App. 2d at 790 (quoting 17 STOEBUCK & WEAVER, *supra*, § 8.9, at 517). The area designated on the Plat as the Reserve Strip is located north of the barbed wire fence situated approximately 10 feet from the northern boundary to the subdivision. While there is evidence the Association maintained the area south of this fence in the Green Space, the Ten Kleys produced other evidence—unrebutted by the Association—that the area north of this fence "was never landscaped as part of the other green space landscaping that took place on the Private Road in approximately 2001 or 2002" and that the Association's landscaper "has never performed landscaping in the isolated area between the fence and the northern property line."

The Association contends it can adversely possess "overgrown property," such as the Reserve Strip, without physical possession so long as it "treat[s] it the way that a true owner would treat overgrown property." In support of this argument, the Association cites to *Heriot v. Lewis*, 35 Wn. App. 496, 505, 668 P.2d 589 (1983), where a claimant successfully adversely possessed land that was "overgrown with berry vines." The court held that the claimant "demonstrated sufficient acts of possession" when considering the nature and character of the land because he "eject[ed] . . . intruders" from it, specifically by removing posts that were set in the ground by his neighbor. *Id.* But as explained in section B.1 above, the Association failed to take any action to eject or otherwise exclude others from the Reserve Strip or the Private Road. Moreover, the Association does not claim to have constructed the fence near the Reserve Strip. Because the Association has failed to establish it possessed the Reserve Strip at all, let alone that such possession was exclusive, *Heriot* is distinguishable.

The trial court nonetheless concluded the Association had adversely possessed the Reserve Strip because the Ten Kleys did not acquire an easement over the Reserve Strip via the Easement and, therefore, "do not have a basis to oppose the [Association's] ownership claim." As discussed in section B.1 above, the fact that the other defendants have defaulted does not mandate the entry of a default judgment in favor of the Association on its adverse possession claims. *See Kaye*, 158 Wn. App. at 326. And as discussed in section C.2 below, there are genuine issues of material fact as to whether the Easement granted the Ten Kleys an easement over the Reserve Strip. Thus, for present purposes, the Ten Kleys

- 18 -

have standing to oppose the Association's adverse possession claim regarding the Reserve Strip. The trial court erred in ruling otherwise.

C.    Easement

Seeking to reverse the trial court's ruling in favor of the Association with regard to the Reserve Strip, the Ten Kleys argue the court erred in concluding on summary judgment that the Easement "does not provide the . . . Ten Kleys with any right to use the reserve strip." The parties assert several interrelated arguments regarding this issue, which we address as follows: first, we decide whether the Easement is valid; and second, we address its scope. Because we conclude the Easement is valid and there are genuine issues of material fact as to whether it extends to the Reserve Strip, we agree with the Ten Kleys that the trial court erred in deciding this issue in the Association's favor on summary judgment.

1.    Validity[3]

The Association argues that even if the Joint Venture retained ownership of the Private Road at the time the Easement was executed in 2022, the trial court erred in concluding the Easement is valid because (a) its execution "is inconsistent with . . . winding up" the dissolved Joint Venture and (b) the Huyettes and Donna

---

[3] The Ten Kleys argue for the first time on appeal that the Association "lacks standing to dispute the validity of the Easement because it is not a party to the Easement and it has no interest in the dominant estate." We decline to address the issue because it was not raised in the summary judgment proceedings below. *See Cano-Garcia v. King County*, 168 Wn. App. 223, 248, 277 P.3d 34 (2012) ("Issues and contentions neither raised by the parties nor considered by the trial court when ruling on a motion for summary judgment may not be considered for the first time on appeal."). Additionally, unlike *Williams v. City of Spokane*, 199 Wn.2d 236, 246, 505 P.3d 91 (2022), which holds we have discretion in appropriate cases to address standing for the first time on appeal, determining this issue would require the resolution of factual issues, such as whether the Association acquired an interest in the Private Road and/or Reserve strip during the pendency of this litigation when the owners of lots 19, 20, and 21 and the Association executed and recorded a document entitled "Quitclaim and Confirmation of Rights," the stated purpose of which was "to clarify the ownership" of the Private Road and Reserve strip. The trial court may address this issue, if and as appropriate, if properly raised on remand.

R. Roberts lacked authority to execute the Easement on behalf of the Joint Venture. As to both arguments, we disagree.

The Association's first argument—that execution of the Easement "is inconsistent with . . . winding up" the dissolved Joint Venture—is contrary to controlling legal principles. A joint venture "is similar to a partnership but it is limited to a particular transaction or project." *Pietz v. Indermuehle*, 89 Wn. App. 503, 510, 949 P.2d 449 (1998). "[P]artnership law generally applies to joint ventures as well." *Id.* A partnership is "an association of two or more persons to carry on as co-owners a business for profit formed under RCW 25.05.055, predecessor law, or comparable law of another jurisdiction." RCW 25.05.005(6). "Each partner is an agent of the partnership for the purpose of its business" and may bind the partnership through their actions. RCW 25.05.100(1). Additionally, "partnership property held in the name of the partnership may be transferred by an instrument of transfer executed by a partner in the partnership." RCW 25.05.105(1)(a).

The parties agree the Joint Venture was dissolved at the time it executed the Easement in 2022 because it had sold all of the residential lots in the subdivision and transferred governance of the Association to the homeowners. *See* RCW 25.05.300(2)(c) (stating that a partnership for a particular undertaking is "dissolved, and its business must be wound up," upon "completion of the undertaking"). "[A] partnership continues after dissolution only for the purpose of winding up its business." RCW 25.05.305(1). A partner "may participate in winding up the partnership's business" (RCW 25.05.310(1)), and the partnership is bound by a partner's act after dissolution that "[i]s appropriate for winding up the

- 20 -

partnership business" (RCW 25.05.315(1)). RCW 25.05.310(3) lists several actions that may be performed by a "person winding up a partnership's business," including "dispose of and transfer the partnership's property" and "perform other necessary acts."

Given the broad range of activities encompassed by these winding up statutes, we conclude the Easement was validly executed for the purpose of winding up the business of the Joint Venture. Although the Joint Venture had dissolved, it continued "for the purpose of winding up its business." RCW 25.05.305(1). The original purpose of the Joint Venture was to develop Stoney Meadows. In 2022, the Joint Venture's sole remaining connection to the Stoney Meadows subdivision was its claim of ownership of the Private Road and Reserve Strip. Granting an easement for ingress and egress over this area constitutes a "dispos[al] of and transfer [of] the partnership's property" or, at a minimum, an "other necessary act[]." RCW 25.05.310(3). Accordingly, contrary to the Association's argument, the Easement was validly executed for the purpose of winding up the business of the Joint Venture.

The Association's second argument—that the trial court erroneously concluded the Huyettes and Donna R. Roberts had authority to execute the Easement on behalf of the Joint Venture—also fails. The Easement states it was executed by the Joint Venture and identifies the grantors as "WILLIAM D. HUYETTE and SHIRLEY A. HUYETTE, husband and wife, and DONNA R. ROBERTS, the only surviving shareholder or officer of STONEY MEADOWS, INC., a dissolved Washington corporation, all of whom are the only members of

STONEY MEADOWS JOINT VENTURE, Declarant of the plat of Stoney Meadows Subdivision." It is undisputed that prior to its dissolution, the Joint Venture was comprised of William D. Huyette, Shirley A. Huyette, and Stoney Meadows, Inc. Although Stoney Meadows, Inc. is a dissolved corporation, it can properly take actions to wind up its business. *See* RCW 23B.14.050(1)(e) (stating that "[a] dissolved corporation continues in corporate existence but may not carry on any business except that appropriate to wind up and liquidate its business and affairs," including "[d]oing every other act necessary to wind up and liquidate its business and affairs"). It did so here.

The Association nevertheless contends the Easement is invalid because the signatories did not "denote[] on their signature lines[] that they were signing in their capacity as a member of the Joint Venture or as an officer/director of [Stoney Meadows, Inc.]." In support of this argument, the Association cites to several cases in which courts have imposed personal liability on persons who have signed contracts purportedly on behalf of a principal.[4] These cases are inapposite because, unlike the signatories in these cases, the grantors of the Easement are not attempting to escape personal liability. And neither the Joint Venture nor the grantees (the Ten Kleys) are seeking to invalidate or void the transaction. Thus, the trial court did not err in concluding the Easement was validly executed by the Joint Venture.

---

[4] *Wilson Court Ltd. P'ship v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 952 P.2d 590 (1998) (personal guaranty of corporation's commercial lease); *W. Mach. Co. v. Nw. Improvement Co.*, 254 F.2d 453 (9th Cir. 1957) (contract for sale and purchase of coal washing machinery); *Cas. Co. of Am. v. Beattie*, 75 Wash. 166, 134 P. 817 (1913) (liability policy of insurance); *Karatofski v. Hampton*, 135 Wash. 139, 237 P. 17 (1925) ("loggers' liens").

2. Scope

Having concluded the Easement is valid, we turn to its scope. "The intent of the original parties to an easement is determined from the deed as a whole." *Sunnyside Valley Irr. Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). Courts may not consider extrinsic evidence if the plain language of the easement is unambiguous. *Id.* But if ambiguity exists, "extrinsic evidence is allowed to show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions." *Id.*

The Easement here states that the grantors "declare, grant and convey" to the Ten Kleys "as owners of the property described hereinbelow as the Benefitted Property, a perpetual easement for ingress, egress and utilities over and across the following described real property":

> THAT PORTION OF THE PLAT OF STONEY MEADOWS, ACCORDING TO THE PLAT THEREOF, RECORDED IN VOLUME "H" OF PLATS, PAGE 454, RECORDS OF CLARK COUNTY, WASHINGTON THAT IS ADJACENT TO LOTS 19, 20, AND 21 OF SAID PLAT, AND LABELED ON SAID PLAT AS "54' NONEXCLUSIVE PRIVATE ROAD & UTILITY EASEMENT RESERVED FOR FUTURE DEDICATION AS PART OF LOT 17/1."

Because the Easement describes the easement by reference to the Plat, we may refer to the Plat in determining the meaning of the plain language of the Easement. *See Cook*, 57 Wn. at 397 (observing the "general rule . . . that reference to a plat or map in a deed of conveyance makes it a part thereof").

The language of the Easement is ambiguous as to whether the grantors intended to include the Reserve Strip in the real estate described therein. The Plat

contains separate notes and markings referring to the "1' reserve strip" and the "54' foot . . . private road & utility easement." But the Easement does not refer to the Reserve Strip by name and, instead, only refers to the "portion of the plat" that is "adjacent to lots 19, 20, and 21" and labeled as the "54' nonexclusive private road." This language indicates the Reserve Strip is not included in the real estate described in the Easement. Yet other language suggests the opposite. The Easement expressly states that it is to "inure to the benefit of" the Northern Property, that the Ten Kleys are the owners of the Northern Property, and that the purpose of the Easement is "for ingress, egress and utilities" over the described real estate. But the Plat indicates the Ten Kleys cannot access the Northern Property across the Private Road without also traversing the Reserve Strip. This language in the Easement indicates that either (a) the grantors inadvertently omitted the Reserve Strip from the Easement or (b) the Reserve Strip is part of the "54' private road" and, therefore, is encompassed by the Easement.

Because an ambiguity exists in the language of the Easement, we may rely on extrinsic evidence to "show the intentions of the original parties, the circumstances of the property when the easement was conveyed, and the practical interpretation given the parties' prior conduct or admissions." *Sunnyside Valley*, 149 Wn.2d at 880. But this extrinsic evidence, too, fails to clarify the parties' intent. The Reserve Strip is not visible to the naked eye or demarcated by physical boundaries. Nor is the Reserve Strip identified by name in any deed in the record, which suggests the Joint Venture retained ownership over the Reserve Strip after platting the subdivision. But a litigation guarantee prepared by Old Republic

National Title Insurance Company (apparently procured by the Ten Kleys in anticipation of executing the Easement) states that as of February 7, 2022, title to the following described land was vested in the Joint Venture:

> THE NORTHERN 270.23 FEET OF NE 171ST AVENUE LYING WITHIN STONEY MEADOWS AS RECORDED UNDER BOOK "H" OF PLATS, PAGE 454, RECORDS OF CLARK COUNTY, WASHINGTON.
>
> EXCEPT A 1 FOOT RESERVE STRIP AS SHOWN ON THE FACE OF THE PLAT.

This evidence suggests the Joint Venture did not own fee simple title to the Reserve Strip in 2022 and the Easement does not include that land.

Additionally, William D. Huyette has made various conflicting statements over the last two decades regarding the Joint Venture's interest in the Private Road and Reserve Strip. In 2006, he told the then-president of the Association's Board that "the Private Road was owned by the owners of Lots 19-21, that [the Joint Venture] had been dissolved for years, and that he wanted nothing to do with Stoney Meadows." And when William D. Huyette was asked in his October 2023 deposition whether the Joint Venture intended to continue to own the Private Road after all the lots were sold and houses built, he stated the Joint Venture "would not have any interest in *any part of the development*" following expiration of the "warranty period," which he defined as a period of 7 to 10 years after the last lot was sold. (Emphasis added.) William D. Huyette also testified that "it was not [his] intent for either [himself] or Stoney Meadows Joint Venture to retain a residual interest" in the subdivision. Yet in 2022, he and the other members of the Joint Venture executed the Easement, indicating he believed the Joint Venture retained

- 25 -

some interest in the Private Road and possibly in the Reserve Strip. When asked at his deposition why he executed the Easement, William D. Huyette replied, "Just an attempt to help Mr. Ten Kley access his property."

In *Kelley v. Tonda*, 198 Wn. App. 303, 393 P.3d 824 (2017), a case involving a similarly confounding chain of title to disputed real estate, our court reversed the trial court's summary judgment rulings and remanded for trial. In that case, Kelley filed an action against the Tondas, his neighbors, asserting that a disputed gravel road near their properties was not a public right-of-way. 198 Wn. App. at 310. At issue were two writings pertaining to the disputed real estate. The first document was a 1907 agreement in which a railroad company agreed to dedicate the real estate to the county for public road purposes in exchange for the county's agreement to vacate and discontinue its use of other land in the future. *Id.* at 314. The second document was a 1908 deed executed "in pursuance of" the 1907 agreement in which the railroad company granted, conveyed, and dedicated the same real estate to the county "so long as" the county used it for the purposes of public roads or highways. *Id.* at 315-17. The trial court granted summary judgment in favor of the Tondas after concluding the undisputed evidence showed the 1907 writing conveyed a right-of-way to the county and the 1908 deed was ineffective at restricting or conditioning the county's use of the land. *Id.* at 318.

On appeal, we reversed and remanded for trial because "[t]he parties' intent in this matter is an issue of fact, unresolvable by summary judgment." *Id.* at 318. We initially observed that summary judgment is not warranted "'in situations where, though evidentiary facts are not in dispute, different inferences may be drawn

therefrom as to ultimate facts such as intent.'" *Id.* at 311 (quoting *Preston v. Duncan*, 55 Wn.2d 678, 681-82, 349 P.2d 605 (1960)). In analyzing the parties' arguments, we noted "[t]he mixed language of the 1907 writing—seemingly contemplating both present and future conveyances, obligations, and conditions— obfuscates the intent of the parties." *Id.* at 317. We then considered "the context of the entire transaction" and concluded the parties' actions, namely the execution of the 1908 deed, gave "rise to an inference that the parties intended to convey an interest in the land." *Id.* When considering these "competing inferences" in "the light most favorable to the nonmoving party," we concluded summary judgment was inappropriate on the issue of which document of conveyance granted an interest in the land to the county. *Id.* at 318. Similarly, depending on which document conveyed an interest in the land to the county, we observed there were "competing inferences regarding the type of interest that was conveyed" in the 1907 agreement or 1908 deed. *Id.* at 320-21. We noted that for both of these issues, the parties' intent "may be illuminated by additional evidence presented on remand." *Id.*

Here, too, the Easement and context of the entire transaction give rise to competing inferences regarding the parties' intent. It is possible that the Private Road and Reserve Strip are separate parcels of land that were both owned by the Joint Venture when it executed the Easement but, either purposefully or inadvertently, the Joint Venture omitted the Reserve Strip from the Easement. Alternatively, it is possible that the Reserve Strip is located within the hatched area marked on the Plat as the "private road" and, therefore, intended by the Joint

Venture to be encompassed within the real estate described in the Easement. Like in *Kelley*, "[t]he parties' intent in this matter is an issue of fact, unresolvable by summary judgment." *Id.* at 318.[5]

In sum, because there are genuine issues of material fact as to whether the Easement granted the Ten Kleys an easement for ingress, egress, and utilities over the Reserve Strip, the trial court erred in deciding this issue on summary judgment.

D.   Attorney fees

The Ten Kleys argue the trial court erroneously denied their motion for attorney fees under RCW 7.28.083(3). The statute provides:

> The prevailing party in an action asserting title to real property by adverse possession may request the court to award costs and reasonable attorneys' fees. The court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just.

Applying this statute, the trial court denied the Ten Kleys' request for attorney fees for three reasons, which we address in turn below.

---

[5] Nor do the parties cite any legal authority that resolves the ambiguity surrounding the Reserve Strip. There are no Washington statutes or cases addressing reserve strips. Thurston County, Code 18.08.240 defines the term as "a parcel of land located usually at the edge of a subdivision for the purpose of restricting access from the end or side of a street." Decisions from other states shed limited light on the issue. *See, e.g., Maroney v. City of Malvern*, 899 S.W.2d 476, 478 (Ark. 1995) (holding developer retained ownership of reserve strip despite subsequent enactment of ordinance prohibiting reserve strips); *J.C. Penney Co. v. Andrews*, 386 N.E.2d 923 (Ill. Ct. App. 1979) (holding that landowner's reservation of two-foot-wide strip of land to display advertising during development of subdivision did not violate public policy). The Texas Supreme Court has aptly observed, "It is well known that separate ownership of long narrow strips of land, distinct from the land adjoining on each side, is a fruitful source of litigation and disputes." *Cantley v. Gulf Production Co.*, 143 S.W.2d 912, 914 (Tex. 1940). To avoid such scenarios, Texas courts "presume[] that a grantor has no intention of reserving a fee in a narrow strip of land adjoining the land conveyed when it ceases to be of use to him, unless such fee is clearly reserved." *Id.* In short, while this legal authority suggests the Joint Venture created the Reserve Strip with a purpose in mind, it does not clarify what that purpose was or whether the "1' reserve strip identified on the Plat is encompassed within the "54' private road" or, rather, its own separate and distinct tract of land.

The first reason that the trial court denied the Ten Kleys' request is it concluded RCW 7.28.083(3) "does not apply in these circumstances (*i.e.*, where an easement holder defends against a claim for adverse possession." The trial court misinterpreted RCW 7.28.083(3), as the plain language of the statute does not limit an award of attorney fees to a prevailing party based on the nature of that party's interest or lack thereof in the disputed real property. Under a plain reading of RCW 7.28.083(3), the Ten Kleys could, in theory, recover attorney fees if they are "[t]he prevailing party in an action asserting title to real property by adverse possession." *Id.* The trial court erred in interpreting the statute otherwise.

The two other reasons the trial court denied the Ten Kleys' request for attorney fees are because awarding attorney fees "would not be equitable and just in light of the unique facts and circumstances of this case" and because the Ten Kleys "did not properly segregate their attorney fees between the adverse possession claim on which they prevailed and the other claims in the case." These issues should be addressed by the trial court on remand following resolution of the remaining issues. The trial court may then consider whether an award of attorney fees to the Ten Kleys would be "equitable and just" and whether the Ten Kleys have properly segregated their attorney fees between the adverse possession claim and the other claims.

Lastly, both parties request attorney fees on appeal. Because this case has not yet concluded, these requests are premature. The trial court may consider this issue on remand and award appellate attorney fees if and when it is appropriate to do so.

Affirm in part, reverse in part, remand for further proceedings.

_Feldman, J._

WE CONCUR:

_Chung, J._